120

THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* FRANCISCO M. SUSONI ET AL., Defendants and Appellants. SAME, Plaintiff and Appellee, *v.* TOMÁS TORRES CORTÉS, Defendant and Appellant.

Nos. 16004 and 15851. Resubmitted December 11, 1957.—
Decided March 19, 1959.

*Francisco M. Susoni pro se* and *Pablo Defendini* and *Santos P. Amadeo* for appellants. *Hiram R. Cancio, Secretary of Justice* (*José Trias Monge, former Secretary of Justice,* in the brief), and *Rafael L. Ydrach Yordán* and *Ramón Olivo Nieves, Fiscal* and *Special Fiscal of the Supreme Court,* respectively, for appellee.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

The Superior Court, Arecibo Part, found Francisco M. Susoni and Tomás Torres Cortés, attorneys at law, guilty of contempt and sentenced them to 30 days in jail. Both have appealed from the judgment.

The trial of the case filed by The People of Puerto Rico against Pedro Matos Matos for a violation of § 192 of the

Penal Code [1] was being held in the Arecibo Part of the Superior Court. The trial commenced on June 10, 1954. The defendant was represented by Mr. Franciscso M. Susoni and Mr. Tomás Torres Cortés. The defense announced that Mr. Baltasar Quiñones Elías, Mr. José Luis Feliú Pesquera, and Mr. Archilla Laugier were also attorneys in the case and requested that their absence be excused. The jury having been constituted and a question of law raised by the defense having been overruled, the defendant was arraigned, again he pleaded not guilty, and the judge ordered that the witnesses be called and sworn. The witnesses were sworn; however, the names of those called by either party do not appear from the record.

Elba González Álvarez, the first witness for the prosecution, made reference in the course of her testimony to Fundador Rodríguez Viruet, and shortly thereafter the following occurred, as it appears from the transcript of the stenographic notes (Tr. Evid. 112–16):

"Upon examination by the Judge, she testified:
Q. Do you know Fundador?
A. I saw him that day for the first time.
"Upon examination by Mr. Susoni, she testified:
Q. Have you seen him again?
A. Yes, sir.
Q. Do you see him here now?
A. Yes, sir.
Q. Where is he?
A. Over there.
"The Court: Why is Fundador in the courtroom if he was called as a witness?
"Mr. Susoni: I apologize to Your Honor because I had my back turned, and now that Your Honor has made that statement,

---

[1] "Section 192. If any person shall interfere with or impede the members of the board of registration in any way in the performance of their duties, such person shall be deemed guilty of a felony and upon conviction thereof shall be imprisoned in the penitentiary for not less than one nor more than five years."

I know he is here, and I gave a note to the marshal to place the witnesses under the rules of the Court as soon as they arrived.

"The Court: He can not ask the name of every person who enters the room, nor can he forbid them to enter the courtroom. That depends on the purpose and the morals of the person who is called as a witness. He has testified in other cases and he knows that the witnesses do not go into the courtroom to hear the other witnesses testify, and he should know his responsibility as a witness.

"Mr. Torres Cortés: We are going to take exception to Your Honor's statement.

"The Court: Exception is taken. But you can not argue it in the presence of the jury.

"Marshal: I do not know the witnesses. But if ...

"The Court: The marshal has no explanation. The gentleman came in. The attorney has apologized and this gentleman should be placed under the rules of the Court:

"Fundador Rodríguez Viruet: Your Honor, I . . .

"The Court: You can not speak and interrupt the work of the Court. You are sentenced by the Court to pay a five-dollar fine or serve five days in jail. Marshal, take care of the defendant. The ladies and gentlemen of the jury are going to retire for a moment while the attorney raises a question of law. Marshal, you may withdraw the ladies and gentlemen of the jury. Mr. Torres' objection to the Court's statement will be entered upon the record.

"Mr. Torres Cortés: We believe, Your Honor, that the statements which Your Honor has made in the presence of the jury to the effect that the presence of one of the witnesses for the defense in the courtroom while another witness is testifying is a question of morale and qualification of the witness, that a witness who has appeared in other prosecutions should know his responsibility and duty as such, are highly injurious to the rights of our defendant. We also take exception to the fact that a witness for the defense has been punished for contempt in the presence of the jury, which in our opinion is also injurious to the rights of our defendant.

"The Court: I wish to state in the record that the witness guilty of contempt to whom colleague Torres refers, interrupted

the order of the Court by talking in the corridor for the public without the Court's authorization, and that his interruption was not proper.

"Mr. Susoni: Your Honor, I believe that Your Honor did not hear the witness correctly; he was asking the Court leave . . .

"The Court: The colleague can not allege a defense in favor of that gentleman now.

"Mr. Susoni: Your Honor made reference to the witness in this case, who is a witness in the case and is going to testify, and I am going to ask Your Honor to instruct the jury accordingly. Fundador Rodríguez Viruet was not, in my opinion, disrespectful to Your Honor. When he was talking he was interrupted.

"The Court: The colleague has made a poor visual interpretation. The colleague is mistaken in saying that Viruet was asking leave of the Court; the witness spoke and after he spoke and I punished him for contempt, he raised his hand to ask for leave as do the children in school to ask permission to talk. That is why the Court has adjudged him in contempt, because he interrupted the order, the Judge's attention, because he interrupted him with his statements. He had absolutely no right to talk, and no pronouncement had been made against him, and the attention of the attorneys was being called to the fact that one of the witnesses for the defense was in the courtroom, which we learned from the witness' testimony.

"Mr. Susoni: For the purposes of the record, we wish to say that the statements which Your Honor made in the presence of the jury, particularly in connection with a witness who is material to the trial of the case, tend to injure the witness' morale and, hence, his credibility. We do not question the Court's authority to preserve the order and respect of the Court.

"The Court: Bring back the jury."

When the jury returned to the courtroom, the Court proceeded with the examination of the witness, at the termination of which it adjourned until the next day, June 11, 1954. The jury remained under the marshal's custody.

Work was resumed the following day during which several witnesses testified; and in the afternoon session, while

the defense was cross-examining the witness Agustín Massanet, the following took place (Tr. Evid. 225–31) :

"Q. When you saw the commotion caused by the facts which you have related, did persons jump out of the window, didn't they run out through the door?

"A. They ran out through the door, not through the window.

"Q. Did you not testify before that you had seen people jumping out of the window?

"A. No, sir.

"Prosecuting Attorney Ruiz: He has not said that at any time. He has not said that anyone jumped out of the window.

"Mr. Susoni: I am laying down the foundation to challenge the witness' credibility, laying the bases through his testimony at the first trial.

"District Attorney Ruiz: He can not use the testimony given at the first trial; the testimony given at the first trial appears in the record.

"District Attorney Vera Mercado: We are referring to this record, Your Honor.

"Mr. Susoni: It is the testimony of a witness in connection with which we wish to lay down the bases. When testifying in connection with the same facts and the same criminal action he gave a different account, and we ask Your Honor to lay down the bases to use the testimony given by him in another sense.

"The Court: The testimony which he gave in open court?

"Mr. Susoni: In open court.

"The Court: The fact is that he has a right to challenge the witness' testimony for having made statements which are contrary to those which he is making now as to time, place, circumstances.

"District Attorney Ruiz: If your Honor will please, and since those statements or any other statements are those which the witness made, and since they appear in a public record, he must show him that testimony. The witness should be given an opportunity to refresh his memory, confronting the witness' first testimony with that which he is giving now.

"The Court: [We presume that Mr. Susoni was doing the talking.] We requested the record of the case; we took the

steps; now we have a right to lay down the bases according to The People's theory.

"The Court: The Magistrate has not been asked for anything since the commencement of this trial; the Magistrate was asked, as dilatory tactics, to order the stenographer to make a transcript of the evidence presented at the trial, and to continue the trial until the transcript was made. The Court refused to continue the trial. That situation is clearly stated in the ruling of the Court, and he is given an opportunity to bring the transcript to the trial in case it is needed in the course of the prosecution. The District Attorney's objection is sustained.

"Mr. Susoni: We respectfully take exception.

"The Court: That is not the way of challenging or of laying down the bases, nor have you come under the law as it stands in Puerto Rico.

"Mr. Susoni: For the purposes of the record, we take exception to the ruling of the Court and to the statements made by the Court as respects dilatory tactics. We have the right to believe that, when an attorney resorts to the Court with a judicial petition, he does so in the belief that he is doing so for the best of the defendant's rights; and we believe that those statements, made in the presence of the jury, tend to bring into disrepute the honest representation of the attorneys in the discharge of their functions as officers of the Court.

"The Court: The ladies and gentlemen of the jury do not have to judge the cases by the honesty or dishonesty, or by the low or high morals of the defendant's representatives. The ladies and gentlemen of the jury must rely on the conviction of their conscience, on the basis of the evidence presented by The People and by the defendant, not on the tactics of the attorneys or of the district attorney. The ladies and gentlemen must bear this in mind when the time comes to judge the case, and you should in nowise prejudice yourselves against the defendant.

"Mr. Torres Cortés: We take exception . . .

"The Court: If it is in that connection, the attorney will please be seated.

"Mr. Torres Cortés: For the purposes of the record . . .

"The Court: The attorney will please be seated, else you will be punished for contempt. The incident is over. I repeat, will you please be seated or be punished for contempt.

"Mr. Torres Cortés: It's a new question, Your Honor.

"The Court: Just a moment, the jury may withdraw. Will the colleague please rise. Whereas, Tomás Torres Cortés, attorney in the case, rose from his seat thereby disobeying the Court's order upon the termination of the incident regarding the exception taken by Mr. Susoni, which Mr. Susoni argued at length. Whereas, the Court ordered colleague Torres Cortés to be seated and not to interrupt the proceedings of the Court. Whereas, the colleague obstinately and contumaciously disobeyed the order of the Court. Therefore, this Court believes that the colleague has disobeyed the order of the Court and sentences him to pay a fine of one dollar, or, in default thereof, to serve one day in jail. The Court will recess for the purpose of determining whether the sentence will be executed. (Recess.)

"Marshal: The session of the Court is resumed.

"Mr. Susoni: I wish to inform Your Honor that a very deplorable error has been committed, and that is that the exception to be taken in this case was not the one which was taken; it was to the last words which Your Honor pronounced. When the colleague rose, I was going to do the same; I was going to take exception to the last words which Your Honor pronounced, which were not objected to nor incorporated in the record of the Court after Your Honor disposed of the question which I raised and argued, and then Your Honor addressed the jury. I must confess that I feel hurt by the words which Your Honor pronounced in classing attorneys into low and high morals. I believe that I have always discharged faithfully and uninterruptedly in my life my mission as a lawyer. I can not say that I have not erred; I err daily. I assure Your Honor that I place myself at your mercy for any action you may deem fit, but I feel so deeply hurt that I can not continue in this case. I can not help telling you so.

"The Court: It seems strange that Francisco Susoni, Jr., a bright young man, although he is in the last stages of youth, who has always been so courteous and a gentleman, could have interpreted in such a regrettable manner the statement of the Court in telling the jury that the jury did not have to take into account the statements made by the attorneys or the high or low morals of the attorneys in the cases, because those statements were not addressed to the district attorney or to the attorneys for the defense. I believe that the colleague should be sure of the statements because I have the moral and civic

courage to ratify everything I say and do, and when I commit an error, I am the son of a Spaniard, Spanish blood runs directly through my veins; that at all times and places and through all the ages I have shown high-mindedness and, like a gentleman, I would have made amends. So, neither the colleague nor the other colleague should think that I even intended to hurt you with those words. Regarding the other question, that he rose in order to take exception, the Court can not accept that as an excuse because he should have obeyed the order of the Court to be seated. The Court then takes the statements made by the colleague as a motion for reconsideration and, therefore, overrules the same. Bring the jury back. Do the parties accept that the jury is the same and that it is complete?

"District Attorney Vera Mercado: Yes, Your Honor.

"Mr. Susoni: Yes, Your Honor."

The defense proceeded until the termination of the cross-examination of this witness. Judge Gladys Lasa testified next, and the session proceeded during the evening of that day, June 11. The evidence for The People ended with the cross-examination of witness Juan J. Torres. The defense stated its theory and called to the witness stand its first witness, Fundador Rodríguez Viruet. The following appears from the record of the cross-examination by the district attorney (Tr. Evid. 284–85):

"Q. Mr. Fundador Viruet . . .

"A. Rodríguez Viruet, please.

"The Court: Will you please leave your hands alone, stop gesturing with your hand; that is not the way to behave in Court.

"Mr. Susoni: We wish to take exception to the statements of the Court.

"The Court: Let it be stated in the record that the witness has raised the left hand and with the index finger has pointed to the district attorney in a rude and threatening manner, telling him that that is not his family name; that the Court has been compelled to call the witness' attention as it would to any person who does not behave properly in a courtroom.

"Mr. Susoni: We respectfully take exception."

The examination of this witness having terminated, the defense called William Pérez to the witness stand. During the cross-examination by the district attorney, the following occurred which we transcribe herein (Tr. Evid. 302–11):

"The Court: Not aloud, for yourself.

"Q. Did you read it?

"A. Yes, sir.

"Q. Sir, from this testimony given by Gladys Lasa will you please tell us if the discussion, if all that discussion took place after 1:00 p.m., and will you tell us if in answer to that question you said that the discussion started about half past twelve and that by half past one you had not reached an agreement, and that's when the people started to leave.

"A. Yes, sir, but there is one point there.

"Q. I know there are a lot of points because there are many i's.

"A. I mean that they had not reached an agreement because there was talking inside the registration place, but not that Mr. Matos was inside the registration place at that hour.

"Q. Did you not answer Miss Gladys Lasa that the discussion started at half past twelve and that the registration started at 1:30 p.m.?

"A. Although that's what it says there in part, I know that several persons had registered despite the commotion and the noise, but the registration was delayed for that reason.

"Upon examination by the Court, he testified:

"Q. For what reason?

"A. The people inside the premises, the commotion, the agglomeration itself, the people who were around the tables.

"Q. What about the discussion?

"A. At that moment there was none.

"Q. Was there any when the discussion was going on?

"A. That was before one o'clock.

"Q. Between whom was the discussion? The discussion to which you refer there, which the district attorney says that you mentioned?

"A. It was a matter that came up, because Mr. Matos did not complete the petition; but then he had gone out.

"Q. With whom did he argue? With you?

"A. No, sir.

"Q. With whom did he argue? I am asking you, with whom did Mr. Matos argue, if he did argue? Do not evade my question. Please answer.

"A. Let me explain.

"Q. With whom did Mr. Matos argue, with whom?

"Mr. Susoni: If Your Honor will allow me.

"The Court: Colleagues, please do not interrupt the Court.

"Q. With whom was M. Matos arguing? I am asking you to explain. Then you may give an explanation.

"A. I do not recall.

"Q. You do not recall with whom he was arguing?

"A. No, sir.

"Mr. Susoni: We wish to take exception to the manner in which the Magistrate has conducted the cross-examination. We believe that the witness is being intimidated in such a way that it is impossible for him to give a normal, calm, and fair testimony. The record shows that he has never shown disrespect to Your Honor. However, the loud and impulsive tone of Your Honor tends to frighten those persons who are not normally used to these proceedings.

"The Court: For the purposes of the record, I wish to say that colleague Susoni has deviated from a reality, from the truth, which the attorneys and gentlemen are bound to tell, by insinuating that the Judge has tried to intimidate the witness. If the Judge has raised his voice, it has been for the purpose of orientating the witness and asking him with whom Pedro Matos Matos was arguing. I am sorry that colleague Susoni has deviated from the facts in such a regrettable way, because I would not dare intimidate anyone and much less when I preside a court. What I want is the truth from everyone, whether it affects or benefits one of the parties.

"Mr. Susoni Lens: We respectfully take exception.

"Upon examination by District Attorney Ruiz, he testified:

"Q. My question is whether or not it is true that Miss Gladys Lasa asked you . . .

"The Court: The stenographer asks for a recess. (Recess.)

"Marshal: The session of the Court is resumed.

"The Court: Do the attorneys for the defendant and the prosecuting attorneys accept that the jury is the same and that it is complete?

"Mr. Susoni: Yes, Your Honor.

"District Attorney Ruiz: Yes, Your Honor.

"Mr. Susoni: Your Honor, I wish to inform Your Honor that I am withdrawing from the case now. I can not work any more under these circumstances, and I am ready to accept any punishment which Your Honor may wish to impose on me.

"The Court: Do you feel sick?

"Mr. Susoni: I do not feel sick physically. I feel sick spiritually and morally; my condition is such that I can not proceed with the case.

"The Court: Spiritual illness can not restrain the intelligence and integrity of character and the responsibility of an attorney, nor can it mitigate the colleague's duty. The colleague's duty is to assist this defendant until the termination of the trial, and it was agreed that we would work all night and would sacrifice ourselves in order to please the attorney for the defendant. However, if the colleague feels physically ill, the Court has no objection to continuing the trial of this case until such time as it is reasonably possible for the colleague.

"Mr. Susoni: It is not physically. I was in a condition to work the whole night and tomorrow. It is only the circumstances in this proceeding that have placed me in such a state of mind that I am in no position to do my duty, as required by my sense of responsibility.

"The Court: The Court believes that there is no reason why the colleague should not be in a position to proceed with the defense of his client. The Court can not grant leave to the colleague to withdraw. The Court regrets that the colleague should make such a decision, for you should realize that it would be prejudicial to the administration of justice, that it would be necessary to postpone a case, dismiss a jury, adjourn, without any justification. Moreover, I wish to make it clear, if I said anything that hurt the colleague, which I believe I did not, that affected the colleague personally and that has annoyed the colleague, he knows that the defendant who should be presumed innocent can not be blamed for this annoyance, and that there is sufficient time and sufficient opportunity to discuss those reasonings, those questions which could have annoyed either one or the other person. I believe that the proposition I am making to the colleague is clear, and the colleague should continue to assist the defendant and to assimilate anything that in the opinion of the colleague could have annoyed him, after listening to the explanation I have given him.

"Mr. Susoni: I have reached this point making an effort, but I confess to Your Honor that I can not proceed.

"The Court: The Court is very sorry, but for that reason alone it can not excuse you from assisting this defendant.

"Mr. Susoni: Then Your Honor may make any ruling you may deem proper.

"The Court: The ruling is that the colleague shall continue to do his duty by assisting the defendant, I mean, if he is not physically disable.

"Mr. Susoni Lens: I can not continue, Your Honor.

"Mr. Torres Cortés: Our position is identical with that of colleague Susoni. We also announce that we are withdrawing from this case in view of the circumstances brought about during the proceeding, and we also place ourselves at your mercy.

"The Court: Do the colleagues realize what that means professionally?

"Mr. Susoni: Fully, Your Honor.

"Mr. Cortés: Fully, Your Honor.

"The Court: The Court orders that we proceed with the case. Just a moment, colleague. Marshal, please bring the colleagues back to the courtroom.

"District Attorney Vera Mercado: May it please the Court. We are going to move the Court for a recess.

"The Court: For what reason? What reason does the district attorney have to move for a recess?

"District Attorney Vera Mercado: We withdraw the motion and move the Court to order the jury to retire.

"The Court: The jury may retire. Marshal, please withdraw the jury. Which is the motion?

"District Attorney Vera Mercado: A recess, Your Honor.

"The Court: On what grounds?

"District Attorney Vera Mercado: That the situation brought about suddenly has possibly created excitement, and we would respectfully suggest the Court, and we do so, to adjourn until the situation is calmed down.

"The Court: I believe that the persons who are working here are well educated and should control their impulses and continue to do their duty as their intelligence and responsibility may demand. It seems to me that the question is simple, clear. What happens is that Mr. Susoni made an imputation to the Judge and the Judge answered it the way he wanted to. That appears in the record. The question between Mr. Susoni and

myself is personal and has nothing to do with our duties as attorneys, and also with the oath which we have taken to do our duty as a judge. I believe there is no reason for anything else, unless it is something senseless and beyond the normality of a talented man. Recess.

"Marshal: The Court will recess.

"The Court: The session is resumed. The Court orders the marshal no to permit the district attorneys and the attorneys to leave the courthouse until its work is terminated. Recess.

"Marshal: The Court resumes its session.

"The Court: Are the parties ready to proceed?

"District Attorney Vera Mercado: Yes, we are ready, Your Honor.

"District Attorney Ruiz: We are ready.

"District Attorney Vera Mercado: May it please the Court. Since it is a quarter to 3:00 a.m. and we have been working all day, with the exception of short recesses for lunch and supper, and in view also of the fact that the court stenographer, Mr. Chacón, has complained that his hand is tired from taking down so many stenographic notes, we respectfully move for the continuance of this case to next Monday at 9:00 a.m.

"The Court: If the other party is agreeable.

"Mr. Susoni: No objection.

"The Court: Is the defendant agreeable with the attorney's decision?

"Defendant: Yes, sir.

"The Court: Bring the jury. (The jury returns to the courtroom.) Do the parties agree that the jury is the same and that it is complete?

"District Attorney Vera Mercado: Yes, Your Honor.

"Mr. Susoni Yes, Your Honor.

"The Court: There is a motion pending before the Court regarding the continuance of the case for Monday at 9:00 a.m. Both parties are agreeable to this proposition. The Court is going to decide favorably as requested in the motion, and the witness is summoned to appear on Monday at 9:00 a.m. He must appear in Court to take again the witness stand. Marshal, are there any other witnesses?

"Marshal: Two witnesses.

"The Court: Those witnesses must be summoned to appear on Monday at 9:00 a.m.; also, the attorneys, the witnesses,

and the district attorneys. Since the Court has restricted the jury, I want the consent of the parties in order that the jurors may retire to their homes. If the parties are not agreeable, the Court would have to subject the jury to the rules which were stipulated at the beginning.

"Mr. Susoni: There is no objection on the part of the defense.

"District Attorney Ruiz: Nor on the part of The People.

"The Court: In that case you may retire to your homes. Both parties are agreed that you should retire. Of course, with the same admonitions which the Court has been making every day."

When the session was resumed on Monday, June 14, 1954, at 9:00 a.m., the judge announced that the defendant and the attorneys who were serving during the trial of the case were present. We copy from the transcript of the stenographic record (Tr. Evid. 2–6, hearing of June 14, 1954):

"Mr. Susoni: On Friday, at 3:15 a.m., we appeared in open court and reached a gentleman's agreement between the district attorneys and the attorneys, that we would participate in the recognition of the jury entity and the motion for continuance proposed on Saturday, at that hour, by the district attorneys. We were agreeable to that proposition in the capacity in which we appeared, in the understanding that our position would not be deemed to have changed in any manner whatever, which we repeat here today in order that there be no gap in the record. Since no explanation was made on Saturday about our appearance making it understood that we were resuming our representation, we wish to say that the position of the attorneys is the same today and we move for leave to withdraw.

"The Court: In order to clarify the statements made by colleague Susoni, the Court wishes to state that no stipulation was set forth in the record conditioned upon the fact that the position of the colleagues and of the defendant today, Monday, in connection with which the continuance of the hearing was ordered, would be the same as it was. Should we therefore take it to mean that Mr. Susoni ratifies and insists on his position which he announced early Saturday morning, that is,

Friday evening going on Saturday, in the sense of withdrawing from the representation of the defendant?

"Mr. Susoni: I regret that my colleagues, the district attorneys, did not inform Your Honor of our reiterated agreement, and I regret it deeply because otherwise we would have set it forth in the record, as we are doing now. We did it so that Your Honor would not think that we were going to reproduce it, but that the situation was the same as that of Friday and we so ratify it with all respect due Your Honor.

"The Court: The approval of the stipulation was by word of mouth. So was the district attorney's motion and the colleague's acquiescence. And the Court, after consulting both the attorneys for the defense and the district attorneys whether that was their stipulation and obtaining their acquiescence, granted the same and nothing appeared in the record. The Court was under the impression that the parties would appear today after having pondered on the incidents and their attitude so that the rights of other parties would not be impaired, the rights of The People of Puerto Rico, of the community of the people of Puerto Rico, and the rights of the defendant which are at stake; and the Judge was of the opinion that the colleagues would think it over and conclude that personal matters, injuries which could have hurt their feelings and affect their personality or prestige as to their capacity, the right of the parties, etc., would be resolved in some other way, that is, through reply, through review, in harmony with legal provisions. And in the belief that there is still time, there is still time for such a high-minded, intelligent, and well-educated man as Mr. Susoni and as Mr. Torres Cortés, who is no less educated and intelligent, to meditate intellectually and sentimentally on the fact that this position is unique, difficult, which would place all the parties in a position to take some action with results perhaps not entirely satisfactory and harmonious, not between the same parties involved but in the community where the supreme judge observes and meditates, and who judges everyone, although silently and without a right of review or appeal in the opinion of the citizens, of all the citizens who keep an eye on public men and hold them close to their hearts and to their conscience, and thus judge them without giving them an opportunity to defend themselves, the Judge believes that we should not let that happen. I urge the colleagues, not only as a Judge but as an attorney and a gen-

tleman, to think it over and not to place yourselves in such a position as to compel the Court to take legal action. It is 12:20 p.m. The colleagues have time until 1:30 p.m. to think it over, to ponder over all the questions raised, and to realize that you live in a land of laws, that the codes are open, that the doctrines are open doors for everyone, and that any error committed by a court may be cured by a higher court. Not only an error which may affect a defendant, but an error of the judge who administers justice, is likewise reviewable; and the Supreme Court in its yellow books indicates the good points and the errors committed by the lower judges. For my part, such practice is sound, I approve of it, and it gives me great satisfaction to know that in the three years of my tenure not one single judgment which I have rendered has been reversed. If ever there is a reversal, I shall be glad because I would learn more. It would be a new doctrine that would be placed in my hands, and my heart and my conscience would know how to use it in future cases. So, the colleagues will have until 1:30 p.m. to meditate over this matter. It being 12:21 p.m., the Court adjourns until half past one when it will proceed with this case. Therefore, the district attorneys, the attorneys, and the defendant are formally summoned to appear in Court at half past one in this courtroom. Recess until half past one. The witnesses, attorneys, and defendants who were summoned in any other case are summoned, and anyone who fails to appear will be punished for contempt."

The trial proceeded at two o'clock and the jury appeared in court. The judge announced that the defendant and his attorneys were present, and asked the parties if they were satisfied that the jury was the same and that it was complete, to which the district attorney answered that he was, and Mr. Susoni said (Tr. Evid. 7–16, hearing of June 14) :

"Mr. Susoni: Before making any allegation, we wish to inform, before making any allegation regarding the jury, that we ratify the position which we took this morning.

"The Court: Irrespective of the ratification, let us find out whether the ladies and gentlemen of the jury, 14 in number, are the same jurors who were sitting in this case.

"Mr. Susoni: We have no objection.

"The Court: Are the witnesses for The People and for the defense under the rules of the Court?

"Deputy Marshal: Those for the defense.

"The Court: Who was the last witness to be cross-examined by the district attorney?

"District Attorney Ruiz: We were cross-examining the second witness for the defense.

"The Court: We should proceed with the cross-examination.

"Mr. Susoni: We move for leave to withdraw.

"The Court: The Court can not grant leave to withdraw because you are representing the defendant in this case, which has commenced and all the evidence for The People has been heard and the evidence for the defendant was being offered.

"Mr. Susoni: We have stated the reasons why we can not proceed with this case, and we urge the Court to take such action as may be proper because we are not going to represent the case. If we are compelled to stay we will, but the defendant will not be represented by us.

"The Court: You are ordered to continue to bear the representation of the defendant, exercising the same functions which you had been exercising as attorneys for his defense, because that is your duty as attorneys; and, since according to the Puerto Rican jurisprudence, the attorneys are officers of the Court, the Court orders that you, colleagues, friends, and attorneys, continue as officers of the Court to perform your duty by representing the defendant.

"Mr. Susoni: We respectfully wish to inform the Magistrate that we have stated the reason why we can not continue and we withdraw from the case. If we are compelled by force, we will stay here but the defendant will not be represented by these attorneys.

"The Court: The Court does not compel nor will compel you to stay by force, by the strength of force, but appeals to your intelligence and to your conscience and urges you to stay by the force of reason and by the force of your duty, as attorneys and officers of the Court, not to permit that the high esteem in which lawyers are held when they are in the exercise of their functions as attorney be blemished. Colleagues, this is the only force imposed upon you, that you do your duty by representing and assisting the defendant, which you undertook two or three days ago.

"Mr. Susoni: That is your opinion, Your Honor, which we respect, and for that very reason we believe that we ought not to stay in this case because we can not.

"The Court: We need not insist or argue further because I have tendered you my friendship, comprehension, on a silver platter full of nobleness. I have appealed to you in order to avoid any trouble to you and to the community and to the defendant. If you do not wish to accept that silver platter full of nobleness and persuasion, the Court will have to act in accordance with law. So, let us proceed with the trial.

"(The two attorneys for the defendant leave the table for the attorneys and walk toward the public.)

"The Court: Do not move from there. Marshal, bring the colleagues within the railing. Bring them inside the railing. (The marshal brings back Mr. Torres Cortés.) Please come, Mr. Susoni. Please come back. (Mr. Susoni goes back.) Ladies and gentlemen of the jury, please retire for a moment.

"(The gentlemen of the jury retire from the courtroom.)

"The Court: Do the colleagues insist on that attitude?

"Mr. Susoni: Yes, sir.

"Mr. Torres Cortés: Yes, sir.

"The Court: Do you disobey the order of the Court to continue to represent the defendant?

"Mr. Susoni: In order to obey a superior order, which is one's inability to represent adequately a defendant.

"The Court: Are you physically ill?

"Mr. Susoni: Not physically.

"The Court: Is the other attorney physically disable?

"Mr. Torres Cortés: Not physically.

"The Court: The Court is going to make the following order: . . ."

Thereupon the Judge proceeded to sentence the attorneys for contempt imposing a 30-day jail sentence. The proceedings continued as follows:

"The Court: "In this case against Pedro Matos Matos, G. 52–131, the defendant is sitting in the same chair, but he is deprived of legal representation because the two colleagues who represented him withdrew from the defense. Does the defendant wish to say anything in connection with this situation?

"Defendant Matos: Actually, I am not a lawyer and can not say anything about the situation.

"The Court: Do you condemn that attitude or are you agreeable?

"Defendant Matos: All I can do is inform the Court that, as far as I am concerned, the attorneys continue to be my attorneys.

"The Court: The two of them together with the others continue to be your attorneys?

"Defendant Matos: The legal point raised is completely unusual for me because I am not a lawyer. I don't know in which way any statement which I may make or which may be spread upon the record may affect me adversely or favorably. For that reason, I would prefer that the Court give me time to consult some lawyer or someone, because I really. . . .

"The Court: What the Court only wants to know is, not that you make statements which may affect you or not, but to find out, however, whether or not you are satisfied with the conduct of your attorneys, and you are therefore advised that you enjoy immunity in the sense that any statement that you may make and which in your opinion may affect your case will not be held against you.

"Defendant Matos: Regarding my attorney's conduct, with all respect due the Court I must truthfully say that I approve of the conduct of my attorneys.

"The Court: You say that the attorneys are your attorneys. I want to know if I am wrong so that you may correct me. Do you mean to say that you still want them to be your attorneys and also the other attorney?

"Defendant Matos: No, sir, because if I should insist that they be my attorneys it would be necessary for me, in order to insist that they proceed with the defense of my case, to contradict what I just said to the Court. I understand that, in addition to Mr. Susoni and Mr. Torres Cortés, Luis Archilla Llaugier * appeared or appears in the record as my attorney; and I believe that, although he is in no position to appear before the Court because of his obligation to attend the public hearings at the Capitol, I understand, and should understand, that he is my only attorney at this moment because the other two have waived my representation, and because of the fact that I agree,

---

* It is so spelled in the record.

again with all respect due the Court, with the points of view of my attorneys who have just withdrawn.

"The Court: Marshal, bring back the jury."

When the jury returned the judge advised them that the case would be continued on Wednesday the 16th, and informed the defendant that he was notified that the case would be continued on that date, that he should get in touch with his attorneys for the purposes of his representation, and ordered that all the attorneys of record be summoned.

On June 16, 1954, when the case was called, the judge ordered that a telegram from Mr. Archilla Laugier, informing of his inability to appear because he was serving on a legislative committee, be incorporated in the record. The session adjourned until 2:00 p.m. and the case was called at that hour. The defendant informed the judge that he did not have an attorney and that Messrs. Susoni and Torres Cortés who were acting in the case, had withdrawn. When the judge asked him what was wrong with his other attorneys of record, the defendant replied that he was under the impression that they were his attorneys because they had appeared in the first prosecution. The judge then said that it was not possible to hold a trial without an attorney, and postponed the hearing for a reasonable length of time to enable the defendant to procure legal assistance. However, the court appointed Luis Archilla Laugier and José Luis Feliú Pesquera, and also Antonio Reyes Delgado, Diego E. Ramos, and Luis Pérez Matos to assist and defend him. The judge ordered that, in view of the fact that the other attorneys, with the exception of Luis Archilla Laugier, were not familiar with the details and particulars of the evidence, the stenographers should make a true and faithful transcript of all the statements of the witnesses and to furnish a copy to each of the attorneys who had been appointed, directing the stenographers to start immediately to make the transcript, relieving them from work in the courtroom so that they could

comply with that order. The case was set to be continued on June 21, at 9:00 a.m., and the defendant was summoned formally to appear on that date. When the jury was brought back to the courtroom, the judge asked the defendant whether the ladies and gentlemen were the same, to which the defendant replied that he hesitated to make statements for the court because he was not represented by an attorney and was afraid to incriminate himself. The judge informed the jury that the hearing would be continued on the 21st, gave them the pertinent admonitions, and permitted them to retire to their homes. (Tr. Evid. 16–26, hearing of June 16.)

The case was continued on June 21. Reyes Delgado, one of the attorneys appointed by the court, argued a motion filed in writing to dissolve the jury, alleging in general the disadvantageous position of the attorneys for the defendant, who had to proceed with the defense without stating the defendant's theory, as well as the disadvantage in which they were and would be placed in their arguments since they had not seen or heard the witnesses who had already testified. Another reason adduced was that the jury had been retired too long, and that they were likely to learn the details of the case through the press or through any other means. The judge granted to the parties terms to file memoranda in support of their contentions, and finally denied the motion. The case was postponed until June 28 so as to give the attorneys an opportunity to read the stenographic transcript of the evidence already heard. On the latter date, at 4:00 p.m., the cross-examination of witness William Pérez, which had been interrupted early in the morning of June 11–12 when the incident on the withdrawal of the attorneys for the defense took place, was finally resumed (Tr. Evid. 27–50, hearing of June 28). Such are the facts which, even at the expense of lengthening this opinion, we have preferred to copy literally from the record thereby avoiding, even unconsciously, emphasis or interpretative omissions.

The errors assigned by the appellant attorneys are three:

(1) That the trial judge should have disqualified himself in the incident of contempt; (2) that he abused his discretion by imposing a jail sentence; and (3) that he erred by punishing them because their action, under the circumstances, did not constitute contempt.

 The first error was not committed. The Act of March 1, 1902, "Defining the offense of contempt and providing for the punishment thereof," as amended by Act No. 102 of May 12, 1937—33 L.P.R.A. §§ 517–19—by its § 1 authorized the district courts (superior court) to punish for criminal contempt the following acts:

". . . . . . . .

"(2) Willful disobedience of, or resistance offered to or exerted against, any lawful writ, mandate *or order* issued or made by any such court in a suit or action pending therein. . . ." It provided in § 3 that when contempt is committed in the immediate presence and view of the court . . . the punishment therefor may be imposed immediately *by the judge* of the court, or the presiding judge thereof, and that when a person is charged with contempt committed out of the presence of the court . . . no conviction can be had thereon unless the person so charged shall have been given an opportunity to appear and defend himself against the charge.[1]

_____

[1] Section 7 of the Code of Civil Procedure (1933 ed.), 32 L.P.R.A. § 44, provides:

"Every court has power:

"1. To preserve and enforce order in its immediate presence.

". . . . . . . .

"3. To provide for the orderly conduct of proceedings before it or its officers.

"4. To compel obedience to its judgments, *orders and processes*. . . .

"5. To control, in furtherance of justice, *the conduct of its ministerial officers*, and of all other persons in any manner connected with a judicial proceeding before it, in every matter appertaining thereto." See §§ 28 and 29, 32 L.P.R.A. §§ 162, 163.

Assuming that the action of the appellant attorneys in withdrawing from the trial, under the circumstances revealed by the transcript of the proceedings, constituted contempt, such contempt was committed in the immediate presence and view of a court of justice in the course of a trial, and the punishment must be imposed by the judge of the court or by the presiding judge thereof, as provided by § 3 of the Law of Contempt. The appellants' claim that the trial judge should have disqualified himself would be tantamount to considering this contempt as indirect, committed outside the presence of the court, in which case it would be necessary to file a formal complaint against them and to give them an opportunity to appear and defend themselves against the charge. *Cf. In re Casanova,* 65 P.R.R. 211; *In re Castro,* 52 P.R.R. 133; *People* v. *Valldejuli,* 59 P.R.R. 117; 2 Witkin, California Procedure—*Contempts During Trial* 1728 *et seq. Cf. Nye* v. *United States,* 313 U.S. 33.

In arguing this error, the attorneys make reference to the magistrate's conduct and invoke the doctrine announced in *Offutt* v. *United States,* 348 U.S. 11, 99 L.Ed. 11 (1954). Since we are acquainted with the personal conduct herein involved, we need not elaborate on an analysis to conclude that that decision is not in point. Let us see what happened in the *Offutt* case, which has its roots in *Sacher* v. *United States,* 343 U.S. 1, L. Ed. 717 (1952).[2] At the close of the

---

[2] In the *Sacher* case, the trial in *Dennis* v. *United States,* 341 U.S. 494, 95 L.Ed. 1137 (1951), having already terminated, the presiding judge sentenced several attorneys for contempt under Rule 42(a) of the Federal Rules of Criminal Procedure, on the basis of the conduct observed by them during the trial. The Court of Appeals upheld the conviction, although not as to all the charges, and the Supreme Court denied review. 341 U.S. 952. Thereafter it granted certiorari on the sole question whether the charge of contempt, as and when certified, was one which the accusing judge was authorized under Rule 42(a) to determine and punish himself, or whether it was one to be adjudged by another judge after proper notice, hearing, and opportunity to appear and defend themselves.

Mr. Justice Jackson, speaking for a majority of the Court, described the situation as a *turbulent* nine months of trial. Referring to the decision of the Court of Appeals, he said that Judge Learned Hand had pronounced

criminal trial in *Peckham v. United States*, 210 F.2d 693, Offutt was punished summarily under *Rule 42(a)* of the Federal Rules of Criminal Procedure for the conduct which he observed toward the judge during the trial. The Court of Appeals upheld the conviction (208 F.2d 844), but reduced the punishment from 10 days' imprisonment to 48 hours on the ground that the attorney's conduct could not be considered apart from that of the judge, and that each responded to great provocation from the other.[3]

The judgment in the *Peckham* case was reversed because the Court of Appeals concluded that the judge's conduct to-

conduct as concerted and willfully obstructive and as including persistent obstructive colloquies, objections, arguments, and many groundless charges against the court; that Judge Frank declared that the charges affirmed were because of the lawyers' outrageous conduct—conduct of a kind which no lawyer owes his client, which can not ever be justified, and which was never employed by those advocates, for minorities or for the unpopular. . . .; and that Judge Clark, who would have reversed the entire judgment because of the procedure, stated that, to one schooled in Anglo-Saxon traditions in legal decorum, the resistance pressed by these attorneys on various occasions to the rulings of the trial judge necessarily appears abominable. In the opinion of the Court of Appeals (183 F.2d 201), which found the charges against the judge unfounded, the situation was one in which all was done that could contribute to make impossible an orderly and speedy dispatch of the case: a judge sorely tried for many months of turmoil, constantly provoked by useless bickering, exposed to offensive slights and insults, harried with interminable repetition, who, if at times he did not conduct himself with the imperturbability of a "Rhadamanthus", showed considerably greater self-control and forbearance than it is given to most judges to possess.

The Supreme Court upheld the power of the trial judge to punish summarily, even if he does so upon completion of the proceeding and not immediately upon the occurrence of the offensive conduct of the lawyers. Mr. Justice Frankfurter, in an elaborate opinion in which he advocated the doctrine announced by Mr. Chief Justice Taft in *Cooke v. United States*, 267 U.S. 517, maintained that, under such circumstances involving attacks and insults upon the judge, the aims of justice under Rule 42(a) would be better served if another judge would sit to pass judgment on the conduct. Mr. Justice Black and Mr. Justice Douglas concurred in this opinion, although they held that the defendants were entitled to a trial by jury. In the *Offutt* case, Mr. Justice Frankfurter states for a majority of the Court a view in line with the ground covered in the *Sacher* case.

[3] The attorney's conduct is described in 208 F.2d at 843, and that of the judge as appendix to *Peckham v. United States*, in 210 F.2d at 703.

ward the counsel barred conviction as the product of a fair and impartial trial. Following the doctrine in *Cooke* v. *United States*, 267 U.S. 517, and applying its supervisory power over the federal judiciary, the Supreme Court reversed the summary conviction of Offutt under Rule 42(a) and reaffirmed as a better doctrine that, in cases of that nature in which the personal attack or offensive conduct of the lawyer toward the judge, or the conduct of both, is involved, the summary punishment allowed by Rule 42(a) should be imposed by another judge sitting to pass judgment on the facts.[4]

Apart from the fact that the doctrine announced in the *Offutt* case, in the light of the supervisory power of the Supreme Court over the federal judiciary, defines a rule of procedure for the United States courts, the situation in the present case is different. For the purposes of the procedural issue under consideration, the actions of the appellant attorneys bear no resemblance to that of the lawyers in that case or in the *Sacher* case, and other similar ones. *Cf. Mac-Innis* v. *United States*, 191 F.2d 157, *cert. denied*, 342 U.S. 953; *Hallinan* v. *United States*, 182 F.2d 880, *cert. denied*, 341 U.S. 952. Here there is no, nor were they charged with, offensive or disrespectful deportment on their part toward the presiding judge; nor was the contempt punishment imposed for the purpose of vindicating the decorum and prestige of a court by offending the person of the presiding judge. From the facts related it appears that we are concerned with another type of professional conduct—the obstinate and conscious disobedience of the attorneys to the reiterated orders of the court forbidding them to withdraw from the case and the courtroom in the midst of the proceeding—conduct

---

[4] In line with this ruling, Offutt was tried twice in the district court for conduct injurious and offensive to the court. *Cf. Offutt* v. *United States*, 232 F.2d 69, *cert. denied*, 351 U.S. 988. The Court of Appeals finally affirmed the judgment on the basis of such conduct and reduced the penalty from 48 hours' imprisonment to 6 hours. *Offutt* v. *United States*, 247 F.2d 88, *cert. denied*, 355 U.S. 856.

which, according to our law of contempt and in universality of the view of the courts, it is absolutely necessary to punish summarily without the formalities required by the Bill of Rights as a mode, as stated by Mr. Justice Frankfurter in the *Offutt* case, "of vindicating the majesty of law, in its active manifestation, against obstruction and outrage." *Cf. Ex parte Terry*, 128 U.S. 289; *People* v. *McDonnell*, 37 N.E.2d 159 (Ill. 1941). See *People* v. *McDonnell*, 30 N.E.2d 80 (Ill. 1940); *Klein* v. *United States*, 151 F.2d 286 (1945); *Lyons* v. *Superior Court*, 278 P.2d 681 (Cal. 1955), *cert. denied*, 350 U.S. 876; *In re Clark*, 103 S.W. 1105 (Mo. 1907); *People ex rel. Chanler* v. *Newburger*, 90 N.Y.S. 740 (1904); *Weiland* v. *Industrial Commission of Ohio*, 139 N.E.2d 36 (Ohio 1956); *State* v. *Winthrop*, 269 Pac. 793, 59 A.L.R. 1265, anno. 59 A.L.R. 1272.

■ Because of the serious and detrimental consequences that may result against the integrity of the judicial proceeding the injurious or offensive deportment toward the magistrate sitting at a trial, or the disobedience or scorn of his orders made in the course of the trial, the conduct of the appellant attorneys transcended to a sphere which is greatly injurious to the due administration of justice because it disturbed, and actually had the effect of paralyzing, as it did, the judicial proceeding, because it is a postulate of law in our social system that those who transgress be prosecuted and punished by the courts of justice. And it is also a postulate of constitutional law that no one shall be prosecuted criminally or convicted without legal assistance. The duty which as attorneys for the defense they voluntarily assumed, or was imposed upon them as officers of the court, is a very essential integral part of the postulate of law thus instituted. The dereliction of that function by the attorneys constituted without doubt an undue obstruction of justice, even though there was no preconceived purpose to do so. Proof of this is the paralyzation of the

trial from the evening of June 11–12 until the afternoon of June 28, and the delays and inconveniences which, as revealed by the record, arose out of the withdrawal of the attorneys for the defense until the close of the proceeding. Their own client suddenly found himself in the midst of the trial in a situation of uncertainty and legal abandonment, and the court was suddenly deprived of its jurisdiction or constitutional power to further consider the merits of the proceeding until the defendant was given further legal assistance, either of his own choice or appointed by the court, as was actually done. *Cf. Glasser* v. *United States,* 315 U.S. 60, 86 L.Ed. 680; *Ex parte Hernández,* 54 P.R.R. 396; *Ex parte Resto,* 55 P.R.R. 700; *Rodríguez* v. *District Court,* 59 P.R.R. 650; *People* v. *Travieso,* 60 P.R.R. 518; *People* v. *Izquierdo,* 65 P.R.R. 850; *People* v. *Rodríguez,* 69 P.R.R. 913. *Cf. Rivera Escuté* v. *Delgado,* 80 P.R.R. 800. As far as we have been able to consult contempt precedents based on the conduct of an attorney, that of the appellants herein, deserting their client in the midst of the trial, is unheard of or unusual in the line of authorities of our case law, undoubtedly because of the concept of serious gravity for the administration of justice which every attorney should have deserved in the past.[5]

The delicate responsibility at that moment of the attorneys for the defense, in whom a citizen fighting for his freedom had reposed his confidence and on whom the State also relied in order to give him a fair trial as required by law; the seat of honor that the representation of an attorney

---

[5] So far we have been able to find one case which is substantially identical, *People ex rel. Chanler* v. *Newburger,* 90 N.Y.S. 740 (1904), although from the facts it does not appear whether the desertion of the case by the attorney was a gesture of transitory protest, or if, as in the case at bar, it was definitive; and a very similar case, *Klein* v. *United States,* 151 F.2d 286 (1945), in which, in the course of the trial and after a few days' recess, the attorney refused to return to the court, announcing in writing, during the recess, that he would not continue as counsel.

occupies at present in criminal justice, which representation forms part of the conception of an impartial and fair trial under the individual's constitutional safeguards—aside from the oath and the professional canons—require us, in the discharge of our duty to watch over the administration of justice in the Commonwealth, to strongly and unequivocally condemn the professional conduct observed in this case, independently of the legal punishment imposed by the trial court or of such punishment as this Court may deem fit to impose on appeal. Our failure to do so, or even our failure to attach due importance to the occurrence in this case by not stressing its seriousness, would mean to ignore a situation of potential danger for the exercise of the judicial power vested by the people in the courts of justice, which would be thwarted by the conduct or actions of the judicial officers themselves, whether attorneys or judges. Those considerations equally require that those who assume the role of defenders of alleged offenders must have a clear conception of their fundamental duty, which, on the scale of professional values, should be placed over and above any other conception of a personal character.

██ The appellants do not contend that their conduct does not constitute contempt, which they seem to have admitted from the beginning by placing themselves at the mercy of the trial judge for any punishment he might have wished to impose. They maintain, however, and they so argue in their third error, that they did not incur responsibility or fault because, as alleged in their brief, "it was the trial judge's conduct that impelled the attorneys morally to desert the case." In other words, their position is that, in the light of the judge's conduct, we should condone theirs.

To agree with the appellants by exonerating them legally and morally from all responsibility is to frustrate the principle of public and institutional order in the administration of justice to which we have already referred, which principle should be maintained unharmed over and above any problem

of reciprocal professional conduct between the judge and the attorneys which might be involved herein.[6] We will not undertake a subjective analysis of the state of mind or conscience which the attorneys alleged prevented them from continuing in the trial. We are, however, called upon to judge their conduct in constituting themselves sole arbiters of a situation which they themselves solved by paralyzing the proceeding, in the light of all the attendant circumstances and other factors and of the appellants' responsibility toward their client and the court.

An unbiased analysis of the record does not reveal the serious situation in which, in the face of the fundamental principle of order of law which we should preserve intact, the no less fundamental conception of the personal dignity and freedom of conscience of these attorneys, as individuals and as officers of the court, might be impaired. Moreover, there are always legal remedies available. The judicial behavior that might in some way affect the rights of a defendant or litigant can be spread upon the record for such disciplinary action as a higher court may wish to take, in harmony with what should be an impartial and fair trial. In this case the attorneys for the defense were doing their duty. As has been seen, the conviction in the *Peckham* case *supra* was reversed as a result of the judge's conduct. This does not seem to be an isolated case.[7] No matter how sincere

---

[6] Even in the face of facts such as those in the *Offutt* and *Sacher* cases in which the judge's conduct was under consideration, no view of the majority or the minority was expressed justifying the professional behavior of the attorneys in order to exonerate them from all responsibility. Such behavior was condemned in clear and precise terms. The only problem before the Supreme Court on which there were opposite views was as to the manner of prosecuting and punishing such conduct. The reduction of the 10 days' sentence originally imposed to 48 hours and ultimately to 6 hours (see footnote 4 *ante*) shows in the *Offutt* case the final balance of the weighing made by the Court of the judge's and the attorney's conduct, but such a symbolic condemnation vindicated the majesty and the decorum of the court and of the judicial proceeding.

[7] *Cf. Webber* v. *Webber*, 199 P.2d 934; *Etzel* v. *Rosenbloom*, 189 P.2d 848; *Pickerell* v. *Griffith*, 29 N.W.2d 588; *Berguin* v. *Pacific Electric Ry. Co.*, 263 Pac. 220; *Pilegram* v. *Haas*, 167 P.2d 339; *People* v. *Burns*,

the feelings of the appellants and how honest their opinion regarding the situation which they believed affected them, the course which they took disobeying the orders of the magistrate, thereby protracting the judicial proceeding, is reprehensible. Because when a magistrate, forgetting his position as an impartial trier, takes sides in the dispute, failing to represent, as has been stated, the impersonal manifestation of the law, he represents nonetheless the authority of the law and his orders should not be challenged by those called upon to obey them.

We must consider, lastly, the issue raised by the appellants regarding the punishment in the maximum degree of jail sentence imposed upon them. This aspect rests ordinarily with the discretion of the trial judge, and, as stated in *United States* v. *Mine Workers*, 330 U.S. 258, and it is a principle of general application, in imposing a fine for criminal contempt the judge may properly take into consideration the extent of the obstinate disobedience, the seriousness of the consequences of the contumacious behavior, as well as the importance of deterring such acts in the future. But, as in any other case in which human conduct is involved, the intention with which an act of contempt is committed and the circumstances surrounding it, which may show mitigating elements, though not warranting complete exoneration, must be taken into consideration for the purposes of the penalty to be imposed. *Cf. Cooke* v. *United States, supra*, at 538; *Butterfield* v. *State*, 13 N.W.2d 572, 151 A.L.P. 745; *People ex rel. Chicago Bar Asso.* v. *Goodman*, 8 N.E.2d 941, 111 A.L.R. 1; *Cammer* v. *United States*, 223 F.2d 322 (reversed as to other aspects), 350 U.S. 399; *In re Braun*, 259 Fed. 309.

241 P.2d 308; *Collins* v. *Sparks*, 310 S.W.2d 45; *Podlasky* v. *Price*, 196 P.2d 608; *Anderson* v. *Mothershead*, 64 P.2d 995; *Hansen* v. *St. Paul City Ry. Co.*, 43 N.W.2d 260; *Murr* v. *Murr*, 197 P.2d 369; *Crenshaw* v. *Southern Ry. Co.*, 53 S.E.2d 789; *Delzell* v. *Day*, 223 P.2d 625.

There are circumstances here which call for consideration. As revealed by the record, the judge's conduct was such, without it being understood that we purport to pass judgment on any effect which it may have on the defendant's conviction, that we can not overlook it upon a fair examination of the facts involved. The imputation of "dilatory tactics" made by the judge to the attorneys for the defense in connection with a genuine step taken by the latter in the discharge of their responsibility, was unjustified. Also deplorable were his statements of "high or low morals of the attorneys for the defendant," though impersonally made in the course of an instruction to the jury, and even though the instruction was prompted by the reference made by one of the attorneys to the disrepute of the "honest" representation of the defense in commenting the statement of the judge on dilatory tactics. Those statements of the judge and the improper contempt punishment imposed upon one of the other attorneys in the midst of the trial could have created a situation which, as they stated, made them feel in such a spiritual, moral, and psychic condition that they could not continue in the case. We have certainly condemned the attorneys' conduct. We can not say, however, that there was an absolute lack of facts prompting such conduct, despite its impropriety.

The purpose of the punitive action in criminal contempt is, above all, to vindicate the majesty of the law in the affronted judicial authority. Because of the summary nature of the manner contempt is punished in open court which, as has been noted, is an exception to the Bill of Rights safeguards which is accepted for the purpose of preserving the order, decorum, and integrity of the judicial proceeding, no greater authority should be employed than the least possible power adequate to the end proposed. *Cf. Anderson* v. *Dunn*, 6 Wheat. 204; *In re Michael*, 326 U. S. 224; *In re Oliver*, 333 U.S. 257; *Sacher* v. *United States*, *supra*, at 21 (Black); *Cammer* v. *United States*, 350 U.S. 399. We have already pointed out that the vindication of the law is the end pro-

posed. In view of the foregoing considerations, a punishment of imprisonment is not justified. *United States* v. *Mine Workers, supra; Rosenfeld* v. *United States,* 167 F.2d 222 (C.A. 4). The 30-day jail sentence appealed from is modified to a $100 fine, and, as thus modified, it is affirmed.

 Regarding case 15,851 against Tomás Torres Cortés, we conclude that the punishment for contempt was not in order. The attorney had a legitimate right, in defense of his client, to state in the record the exception which he proposed to take against the instruction given by the judge to the jury and to which we have referred. He had the right to rise for the purpose of raising any new issue, and it was the duty of the judge to listen and decide accordingly. The fact alone that the attorney rose in order to raise an issue did not amount to contempt, even if the judge had ruled a previous incident. *Cf. Bennett* v. *Superior Court,* 222 P.2d 276 (Cal. 1950); *People* v. *Harrington,* 21 N.E.2d 903 (Ill. 1939); *Curran* v. *Superior Court,* 236 Pac. 975 (Cal. 1925); *Ex parte Charles C. Crenshaw,* 259 S.W. 587 (Tex. 1924), 31 A.L.R. 1181, and Annot. at 1185. The cases cited by The People, *Ex parte Lastra,* 56 P.R.R. 534, and *People* v. *Báez,* 72 P.R.R. 167, were based on facts and circumstances which are distinguishable from the facts of this case.

The extraordinary power to punish summarily, without hearing the aggrieved party, vested in the judges as an effective means of preserving the order and the integrity of the judicial proceeding, must be exercised with greater prudence, circumspection, and sense of good judgment, lest it should become, in addition to a vehicle of oppression, a weapon destructive of the proper order and integrity of the proceeding which the law proposed to preserve. The judgment in contempt case 15,851 will be reversed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Belaval did not participate herein.