**PECKHAM v. UNITED STATES.**
**No. 11487.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 24, 1953.

Decided Nov. 19, 1953.

Mr. Albert J. Ahern, Jr., Washington, D. C., for appellant.

Mr. John D. Lane, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., Arthur J. McLaughlin, Asst. U. S. Atty., and William J. Peck, Asst. U. S. Atty. at the time of argument, were on the brief, for appellee. Messrs. Charles M. Irelan, U. S. Atty., Joseph M. Howard, William E. Kirk, Jr., and William R. Glendon, Asst. U. S. Attys., at the time the record was filed, also entered appearances for appellee.

Before EDGERTON, BAZELON and FAHY, Circuit Judges.

FAHY, Circuit Judge.

Appellant was indicted in two counts under the abortion statute, D.C.Code § 22–201 (1951), 31 Stat. 1322.[1] The first count alleged the commission of the offense in May 1951; the second the commission of a like offense in January 1952.[2] The same woman was involved in each instance. At a jury trial appellant

---

1. "Whoever, with intent to procure the miscarriage of any woman, prescribes or administers to her any medicine, drug, or substance whatever, or with like intent uses any instrument or means, unless when necessary to preserve her life or health and under the direction of a competent licensed practitioner of medicine, shall be imprisoned for not more than five years; or if the woman or her child dies in consequence of such act, by imprisonment for not less than three nor more than twenty years."

2. The indictment reads as follows:
"The Grand Jury charges:
"On or about May 2, 1951, within the District of Columbia, Henry L. Peckham, Junior, with intent to procure the miscarriage of Mary M. Ott, otherwise known as Mary Lee Ott, who was then pregnant, used upon her an instrument and means of a kind unknown to the Grand Jury, and administered to her medicine, drug and substance of a kind unknown to the Grand Jury.
"SECOND COUNT:
"On or about January 18, 1952, within the District of Columbia, Henry L. Peckham, Junior, with intent to procure the miscarriage of Mary M. Ott, otherwise known as Mary Lee Ott, who was then pregnant, used upon her an instrument and means of a kind unknown to the Grand Jury, and administered to her medicine, drug and substance of a kind unknown to the Grand Jury."

was convicted on the first count and acquitted on the second. His appeal raises a number of questions.

First we consider whether the indictment was good though it omitted negative averments that defendant, a licensed and practicing physician, did not procure the miscarriages to preserve the woman's life or health. See definition of the crime, n. 1, supra. In Williams v. United States, 78 U.S.App.D.C. 147, 138 F.2d 81, 153 A.L.R. 1213, where the indictment contained the averments this court held it was unnecessary to prove them. We adhere to the ruling there made that the provisions of the statute which give rise to the problem are intended to furnish the defense an opportunity for justification and are no part of the description of the offense required to be proved by the prosecution. Not being essential elements of the offense they may be omitted from the indictment as well as from the proof. See Rule 7(c), Fed.R.Crim.P., 18 U.S.C.A.

Prior to trial the accused moved for return of certain articles he owned, asserted to have been unlawfully seized from his office, and for their suppression as evidence against him. See Rule 41(e), Fed.R.Crim.P. He claimed, *inter alia*, that the search warrant pursuant to which the articles were obtained had been issued without probable cause. In ordering return of some of the articles as agreed by the Government the court held open the question of probable cause pending location of an affidavit said to have been furnished by Mary Lee Ott as the basis in part for issuance of the warrant. Defense counsel asked for opportunity, if the affidavit were located, to see it before the court ruled. After it was found the court, without affording counsel an opportunity to make further objection, held the search warrant valid, inserting his ruling in the transcript at a place which had been left for that purpose.[3] The defense filed a motion for reconsideration on several grounds, including the assertion that the Ott affidavit was not proved to have been executed prior to issuance of the warrant. The trial judge refused to pass upon the matter or to continue the trial so that it could be disposed of by the judge who had heard the motion to suppress.

We think defendant was and still is entitled to an opportunity to complete his attack upon the search warrant after the Ott affidavit had been located. The failure to afford such opportunity, however, is not itself ground for a new trial. Only if the hearing on the validity of the warrant should result in a ruling that it was not valid and accordingly that material evidence should have been suppressed would a new trial be required.[4] See Coplon v. United States, 89 U.S.App.D.C. 103, 114, 191 F.2d 749, 760, certiorari denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690.

Prior to trial the defense moved that the Government be required to elect upon which of the two counts it would proceed. Since the offenses are of the same or similar character they were validly joined in the same indictment. It was not error therefore to overrule the motion when it was presented. Rule 8(a), Fed.R.Crim.P. See, also, Rule 13, and Dunaway v. United States, 92 U.S.App.D.C. 299, 205 F.2d 23. If thereafter "prejudice developed

---

3. The insertion is as follows:
   "The Court: Pursuant to statement to respective counsel, I obtained through the Clerk's office from the official files the original affidavit of Mary Lee Ott, which constituted part of the basis for the issuance of the search warrant in this case and caused it to be marked as an exhibit in the case and filed in the jacket.
   "With this before the Court, I concluded that there was probable cause for issuance of the warrant.

"Upon discovery of this official record of the Court, counsel for the defendant Peckham, Mr. Offutt and Mr. [John J.] Spriggs, were forthwith advised, and further instructed to prepare and present an order promptly, granting in part and denying in part the motion to suppress and ordering the return of such items."

4. As hereinafter appears a new trial is granted for other reasons. The incompleted hearing on the search warrant may accordingly be concluded on the remand.

698

and was not cured by requiring an election or by other relief" material error would afflict the trial, Dunaway v. United States, supra 205 F.2d at page 24. But the accused was acquitted on one count and a new trial is granted as to the other. Accordingly the question of prejudice for failure to require an election is eliminated.

■ The principal witness against the accused was Mary Lee Ott, upon whom the abortions are alleged to have been procured. On her cross-examination it developed that in 1950 she had been a patient in the psychiatric ward of the United States Naval Hospital, Bethesda. While admitting that she had been in this ward she denied having received psychiatric treatment. The defense sought to show through an attache of the hospital, who had brought her records to court in response to a subpoena duces tecum, that she had undergone treatment at the hospital for mental trouble. The records as a whole extended back to December 1947 and the last entry was September 13, 1950. The court would not permit proof in this manner of actual psychiatric treatment, assuming the records would have shown it. Since the evidence was offered only on the question of Mrs. Ott's credibility as it might be affected by her mental condition at the time she testified, and twenty months had elapsed since the alleged treatment there was no abuse of discretion in excluding the evidence.[5] See State v. Hayward, 62 Minn. 474, 496, 65 N.W. 63, 70; Ellarson v. Ellarson, 3d Dept., 198 App.Div. 103, 190 N.Y.S. 6.

■ In January 1952 shortly after the second abortion was said by the complaining witness to have occurred, she entered Mt. Alto Hospital in Washington. A doctor who examined her there testified that in his opinion she had peritonitis secondary to an induced abortion. In so testifying he refreshed his recollection from hospital records. On cross-examination he said he did not rely entirely upon these records, that in treating the patient he studied her entire chart in considerable detail. The court permitted defense counsel to see only those portions of the records which the witness used to refresh his recollection. These included, however, entries that in 1947 there had been an abortion at six weeks, in 1948 "a term still birth", and in 1949 "full term living child", also entries regarding the patient's recent medication of herself and her denial of instrumentation. All of this was disclosed to the jury but the defense was not permitted to see the whole file, the court considering it confidential.

It is contended that the doctor in giving his opinion as to an induced abortion should have been subject to fuller cross-examination on the basis of all records which had been available to him. But his opinion related only to the second count, of which the accused was acquitted. Obviously this removes the basis for claiming error as to the first count, which is all that is before us.

■ The accused took the stand in his own defense. In cross-examining him the prosecution sought to elicit his conversations with his own attorney, to show that he and his attorney had intended to claim falsely that he had not seen the prosecuting witness at all in May 1951. As the trial proceeded, however, defendant actually testified he saw her twice early in May, though not on May 7th as she said and when in fact he was a patient in a hospital. On objection by the defense the attempted cross-examination about conversations of defendant with his attorney was not per-

5. There is some indication the evidence was desired not entirely in connection with the witness' credibility but also to probe her competency to testify at all; but the record as a whole we think does not bear out this suggestion. In any event, if the effort was to undermine the witness' competency it came too late, State v. Whitsett, 232 Mo. 511, 526, 134 S.W. 555, 560, and, further, was inadequate for that purpose, People v. Harrison, 18 Cal.App. 288, 296, 123 P. 200, 203.

mitted. The prosecution then asked defendant if he had heard his counsel in his opening statement say the defendant never saw the complaining witness until January 9, 1952. Defendant was permitted to answer and denied having so heard. The prosecution argued to the jury that this testimony conflicted with counsel's opening statement, erroneously attributing to the latter the following: "I will prove that the first time this defendant ever saw this girl was on May the 9th" (no doubt intended by the prosecutor as January 9). After the jury retired they requested that defense counsel's opening statement in this regard be read to them. This was done over defense objection.

We see no error growing out of these incidents. If the jury had been led to believe defense counsel had said in his opening statement the accused had never seen the prosecuting witness until January 1952, its actual content read to the jury disabused them, for it showed this had not been said. There is no reason to suppose the jury were misled in interpreting the factors involved, namely, what was contained in the opening statement, the actual testimony defendant gave as to seeing Mrs. Ott in May 1951, Mrs. Ott's own testimony, and the questions and arguments of counsel. And we perceive no error in permitting defendant to be asked, and to answer, what he heard his counsel say to the jury. It is true, as appellant points out, the opening statement was not evidence; but it was an occurrence in the presence of defendant and to permit him to be questioned about it was not to treat it as evidence.

There was testimony by an officer that at police headquarters after the arrest he talked with defendant regarding an abortion upon Mrs. Ott and he responded, "No answer", "No statement". On the stand defendant was cross-examined closely about this in the effort to lead the jury to believe he would have denied guilt if he were innocent. No point is made on appeal as to possible error in the original admission of the "No statement" evidence through the officer.[6] The contention now is that prejudice resulted in permitting defendant to be cross-examined as to why he would make no statement to the officer. If it is thought that he was insulated from cross-examination in this regard because of the Fifth Amendment's protection against self-incrimination the point is disposed of by Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054. It was there held that when a defendant takes the stand in his own defense he may be cross-examined about his failure to testify on his previous trial for the same offense. This court has similarly ruled in Viereck v. United States, 78 U.S.App.D.C. 279, 139 F.2d 847, certiorari denied, 321 U.S. 794, 64 S.Ct. 787, 88 L.Ed. 1083. Implicit in these decisions is the right to cross-examine a defendant about his failure to seek to exonerate himself when questioned on a previous occasion, for if such cross-examination does not invade the protection of the Fifth Amendment in the circumstances presented in the Raffel and Viereck cases it does not invade its protection here. And we know of no other basis for excluding the cross-examination, assuming, as we do, that the "No statement" evidence was properly admitted; for even if the accused could validly refuse to make a statement nevertheless when he took the stand he could be asked why he refused.[7]

---

**6.** While at first the court refused to permit the defendant to explain why he made no statement, in the end the defense was permitted to suggest that he wanted to consult counsel: "Now, Mr. Sullivan [the officer], isn't it a fact that Dr. Peckham told you he wasn't answering any questions until you let him call his lawyer? The Court: You may answer. The Witness: No, sir." The testimony then goes into his efforts to obtain a lawyer.

**7.** It is not suggested that the cross-examination was beyond the scope of the direct. We add that from our examination of the record it seems clear such a point would not be valid.

We take up now the court's charge and certain requests of defendant for instructions. The witness Christenson according to his own testimony had assisted in arranging and furthering the first alleged abortion. The court instructed the jury he must be deemed an accomplice and that his testimony should be received with care and scrutinized with caution. Though not in the exact form sought by defendant this adequately covered his request; and the fact that the judge interpolated that he was required by law to give the instruction did not, as appellant contends, vitiate it.[8]

Appellant urges error in the court's refusal of the substance of a requested instruction that Mary Lee Ott while not an accomplice strictly speaking was morally implicated and the jury should consider this as bearing upon her credibility. Thompson v. United States, 30 App.D.C. 352, 362–364, is authority for such an instruction but does not hold that it must be given whenever requested. While we think the instruction should have been given its omission would not itself require a new trial. The jury acquitted appellant on the second count notwithstanding very damaging testimony by Mary Lee Ott. On that count she was not corroborated as fully as with respect to the first. The difference in verdicts indicates the jury gave discerning consideration to her truthfulness notwithstanding the omission of this particular instruction.

It is complained the court failed to define all the essential elements of the crime. It is said no instruction was given as to the necessity of proof beyond a reasonable doubt that the complaining witness was pregnant and appellant did some act or administered some treatment or drug with intent to procure an abortion. But the court did in fact require the Government to establish that defendant prescribed or administered a medicine, drug, or other substance, or used on the woman some instrument or means, that she was pregnant at the time, and that defendant did the act with intent to procure a miscarriage. There was also an adequate instruction on the necessity of finding guilt beyond a reasonable doubt.

Finally as to the charge,[9] it is urged a disproportionate amount of it was devoted to outlining the Government's side of the case. But this occurred primarily in connection with the second count as to which the defense won an acquittal. As to the first count the fact is the defense consisted almost entirely of the case as outlined in the charge, namely, defendant's denial that he performed the abortion, together with

Our disposition of the "No statement" problem disposes of the further contention that it was improper for the prosecuting attorney to argue to the jury that the refusal indicated guilt. During his cross-examination the accused sought to justify his refusal on constitutional grounds. The loss of protection on that score which resulted from his taking the stand carried with it the loss of protection from use of the incident in the prosecution's summation provided the discussion of the point was otherwise fair, a matter referred to infra. See para. 11, Appendix, infra.

8. Appellant also complains that the form of the instruction given on the care with which the testimony of Christenson should be viewed told the jury that Christenson was an accomplice and thus carried the inference that defendant was guilty. The language of the charge, however, is not different in substance from that requested by the accused, as follows:

"The jury are instructed that the witness Christenson is an accomplice as a matter of law and as such they should view his testimony with suspicion and they look to corroboration."

We think the jury understood that they must find the facts.

9. We are aware that appellant also complains of the omission to give instructions that counsel had a right to object to certain gestures and gesticulations of the trial judge, and that the jury should disregard any intonations and gestures the judge exhibited and his statement that defense counsel's statement the prosecution was not brought in good faith was improper. We treat infra the defense's claim of error in the judge's general conduct, and these matters are not likely to recur upon a retrial.

evidence as to his entering George Washington Hospital as a patient, where he remained all of May 7th and for several days thereafter (though, as the court continued, he admitted on cross-examination that the prosecuting witness was in his office twice during the first week of May) and his denials that he went to a hotel to see her as she had testified, or received a phone call from her from there or had any conversations with Christenson, her companion, concerning any abortion, as to all of which Mrs. Ott and Mr. Christenson had testified. Counsel do not suggest what more the court should have said.[10] Here again we would not be warranted in finding prejudicial error.

After the jury retired it appears the judge received a message they desired certain record cards of defendant which had been marked as exhibits. The court let these cards go to the jury without the prior knowledge of defense counsel. Parts of their contents had been admitted in evidence, but some notations on them had not.[11] The cards were pertinent on the question of defendant's truthfulness in testifying that certain named patients had come to his office the afternoon Mary Lee Ott said the second alleged abortion was committed, January 18, 1952. The notations not admitted in evidence indicated the treatment given these persons. Permitting the exhibits to go to the jury in their entirety when their full contents were not in evidence illustrates the danger of acting in the absence of counsel. But the incident, no doubt inadvertent, need not be elaborated upon since it is quite unlikely to recur. We add that the full contents of the cards show nothing significant which had not already been brought to light on cross-examination of defendant.

The defense objected without avail to the question of the prosecuting attorney, in cross-examining defendant, whether during the month of May 1951, his entire practice consisted of performing abortions. Defendant answered in the negative. In the context of the whole evidence, which developed the practice in which defendant was engaged, not limited to abortions, the question, answered as it was, was not prejudicially unfair. The prosecution did not attempt independently to prove other offenses than those on trial. The court, however, in overruling a defense objection to a similar question, that is, whether he specialized in abortions during January 1952, as to which the defense claimed there was no proof, commented that the prosecution had introduced plenty of proof, adding "but it is for the jury". Since there was an acquittal on the second count to which the question related, and because of the court's statement that it was for the jury, his reference to the proof did not constitute prejudicial error, though it should have been avoided.

Appellant contends the court erroneously excluded objections to the manner in which the charge was given, within the rule of Billeci v. United States, 87 U.S.App.D.C. 274, 281–82, 184 F.2d 394, 401–402, 24 A.L.R.2d 881, and Butler v. United States, 88 U.S.App.D.C. 140, 188 F.2d 24. The contention is amplified by the argument that at a bench conference after charging the jury the court would not permit counsel to enter an objection. The transcript shows, however, that this frustrated effort was to enlarge an objection already made that the court's summation of the evidence was not fair to the accused, and was not directed to the manner in which the court delivered the charge. Appellant claims he was also

---

10. The full statement in counsel's main brief on this point is: "We call the Court's attention also to the fact that the charge was inherently prejudicial in that the court devoted 9/10 of the charge to the Government's side of the case, and 1/10 to appellant's version."

11. As to the admission in evidence of some of the contents of the cards we find no error. They had been used by defendant in making notes. He used the notes to refresh his recollection while testifying. He was cross-examined as to the accuracy of these notes, on the basis of what the cards themselves showed inconsistent with the notes.

denied at other times opportunity to object to gesticulations and other allegedly unseemly conduct of the judge toward defense counsel; but the conduct objected to, and the objections themselves, are not within the Billeci and Butler cases. These cases involve the problem of a judge weighting or slanting his views by gestures or intonations. Here the conduct objected to was the judge's manner of ruling, and his attempts to control counsel, in respects which did not include a slanting of his attitude inconsistent with the content of the cold record. Hostility to counsel was at times displayed by the court, but this presents a question not considered in the cases cited.

■■■■■ Prejudicial error is asserted as the result of rejections by the court of certain proffers of evidence made by the defense during cross-examination of Government witnesses. The court was mistaken in basing his rejections upon the theory that during the cross-examination of an adverse witness proffers are never in order. When the examination is direct a proffer, though usual, is not invariably required to obtain review of exclusion of a question, see Rule 43(c), Fed.R.Civ.P., 28 U.S.C.A.; but neither is a proffer invariably inappropriate when the examination is cross and objection to a question is sustained. There is a discretion, which was not abused, and we may not assume it will be abused in the event of a retrial.[12]

■■■■ A number of other questions are presented generally. These include claims of degrading and belittling remarks directed at defense counsel by the judge, restrictions upon cross-examination, the judge's assumption of the function of an advocate, lack of impartiality,[13] and prejudicial remarks by the prosecutor. As to the effect of these matters on the fundamental fairness of the trial this court finds itself divided. Judge Edgerton and Judge Bazelon, constituting a majority of the court, are convinced that the excessive injection of the trial judge into the examination of witnesses, his numerous comments to defense counsel, indicating at times hostility, though under provocation, demonstrated a bias and lack of impartiality which may well have influenced the jury;[14] that, considering these matters and others,[15] examples of which are set forth in an Appendix attached hereto, this court is barred from sustaining the judgment as the product of a fair and impartial trial. This necessitates reversal.

The writer of this opinion feels decidedly that it would have been preferable for the court to have restrained his interruption of the examining process. The Government was well represented and the extent of the judge's participation was not required by his obligation to maintain a firm and salutary control of the proceedings. We have today in No. 11466, Offutt v. United States, 93 U.S.App.D.C. ——, 208 F.2d 842, sustained the contempt conviction of defense counsel due to his conduct in this case but we have reduced the sentence. By sustaining the conviction we have ex-

12. In overruling the motion for a new trial the judge himself pointed out that he had a discretion in this matter.

13. The statement of the court to the jury, after they had returned their verdict, indicating his strong feelings as to the guilt of defendant does not show error in the conduct of the trial itself.

14. Throughout the fourteen day trial there were numerous clashes between defense counsel, on the one hand, and court and prosecutor, on the other. Although defense counsel never requested the court to admonish the jury that these unfortunate incidents were not to be taken against appellant, the majority believes that minimal precautions required such admonition either at the time they occurred or in the charge to the jury. See, for example, United States v. Dennis, 2 Cir., 183 F.2d 201, 225, affirmed, 341 U. S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; and Mansfield v. United States, 8 Cir., 76 F. 2d 224, 232, certiorari denied, 296 U.S. 601, 56 S.Ct. 117, 80 L.Ed. 425, where such instructions were given.

15. Including some of those which we have previously discussed and which the majority concede would not, standing alone, amount to prejudicial error.

pressed our conclusion that counsel was contemptuous, while in reducing the sentence we have reflected our view that his conduct was not altogether separable from that of the judge in treading the area reserved for counsel, thus creating conflict and engendering remarks and attitudes on the part of both court and counsel which afflicted the trial. The writer is persuaded in the end, however, not to join in reversal of the conviction of Peckham. His acquittal on the second count goes far to show that the jury were not misled. Had he been convicted on both counts the writer too would agree a new trial would be necessary, for the guide of the different verdicts by which to judge the effect on the jury would not have been available. He is fortified in his conclusion by the fact that the case under the first count, on which defendant was convicted, was strong, and yet the complaining witness blamed the accused equally with respect to the second count, as to which she was not so well corroborated. The distinction drawn by the jury indicates an impartial consideration of the evidence. The writer adds that the defense was fully presented from an evidentiary standpoint, there was full enough cross-examination of all Government witnesses, the relevant aspects of their characters and lives, as of all other witnesses, were brought to light before the jury, and the jury were adequately instructed. He realizes it can be argued that except for defects in the trial which lead the majority to reverse the defendant might have been acquitted also on the first count. But the imponderables involved in judging the effect of these defects, as distinct from specific rulings or actions which we have separately considered and find in no instance to constitute prejudicial error, call for an appraisal based upon the entire trial, including its result. The writer concludes the jury were not led away from a fair and impartial consideration of the case, and would affirm.[16] The majority believes that, in the light of the disorderly atmosphere of the trial, it would require too great a degree of speculation to say that the appellant was fairly tried on the issues relevant to the first count.[17] We are all agreed that the misconduct of appellant's counsel which helped produce such atmosphere is for the contempt proceedings against counsel, and scrupulous care must be taken not to weigh such misconduct against appellant.

The judgment will be reversed. On the remand a further hearing upon the motion to suppress should be granted if requested.

It is so ordered.

### Appendix

These excerpts from the record are examples of the matters referred to at pages 13 and 14 of the opinion [702 of 210 F.2d], supra:

1. "[Mr. Offutt]: You said that George objected to it. When did he object to it? Give us the date.

"Mr. McLaughlin: Now, he is right back again, Your Honor.

"Mr. Offutt: I don't want the conversation.

"The Court: Now, Mr. Offutt—

"Mr. Offutt: I misunderstood Your Honor's ruling.

"The Court: No, I think you understood.

"Mr. Offutt: I did not, I give you my word of honor.

---

16. " * * * The harmless-error statutes [see Rule 52(a), Fed.R.Crim.P.] have been adopted to give discretion to overlook errors which cannot be seen to do injustice." Stein v. People of New York, 346 U.S. 156, 193, 73 S.Ct. 1077, 1097. Though the Supreme Court divided in this case the dissent is not due to disagreement with this statement.

17. The majority cites Krulewitch v. United States, 336 U.S. 440, 444–445, 69 S.Ct. 716, 93 L.Ed. 790; Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557; and Bollenbach v. United States, 326 U.S. 607, 614–615, 66 S.Ct. 402, 90 L.Ed. 350.

"The Court: You can't be as stupid as all that. Do not transgress my ruling again." Pp. 253–254.

2. "Mr. Offutt: That she had tried to induce the doctors in the Naval Medical Center, in 1950, to perform an abortion on her?

"Mr. McLaughlin: 1950?

"The Court: 1950, I think that is an outrageous question to ask.

"Mr. McLaughlin: He is in contempt of court, Your Honor.

"The Court: It has nothing to do with the issue of this case.

"I think a witness—I am not referring to this witness—but I think a witness is entitled to some protection and I don't think such questions should be asked about.

"Mr. McLaughlin: And I think my friend is in contempt of court, Your Honor, because the question asked this witness is pertaining to this abortion in January, whether or not he told Mr. Offutt that this girl performed or attempted to perform this abortion by inserting the glass tube.

"My friend knew what we were talking about and I say in reference to this incident that his imagination is running away from him; he is in contempt of court in asking the question.

"The Court: I think the question is highly improper, and your point is well taken, Mr. McLaughlin." Pp. 620–621.

3. "Mr. Offutt: I move Your Honor to admonish Mr. McLaughlin.

"The Court: I don't think you are a person to object to interruptions. You may proceed.

"Mr. Offutt: I object to that statement, Your Honor.

"The Court: You may do so and your objection is noted on the record." P. 661.

4. "[Mr. Offutt]: * * * I move for a mistrial and I say to Your Honor I object to Your Honor and the District Attorney, he has raised his voice too—right now.

"The Court: Go back to counsel table.

"Mr. Offutt: And I object, Your Honor.

"The Court: Go back to the counsel table or I will have the Marshal put you there." P. 941.

5. "The Court: You may go back to counsel table and proceed with the examination of the witness.

"Mr. Offutt: May I have an objection?

"The Court: Go back to counsel table.

"Mr. McLaughlin: May I say that the defense attorney—

"The Court: Go back to counsel table.

"Mr. Offutt: I object to your putting your hand up like that—

"The Court: Go back to counsel table. Stop, or I will have the Marshal pull you back to your seat." P. 1081.

6. "Mr. Offutt: If the Court please, I respectfully move Your Honor for a mistrial and—

"The Court: Motion denied.

"Mr. Offutt (Continuing):—and I want to put the proffer on the record at this time—

"The Court: Motion denied.

"Mr. Offutt: And I want the record to show that Your Honor raised your hand—

"The Court: Motion denied.

"Mr. Offutt (Continuing)—and ordered me back from the bench.

"The Court: Motion denied. Proceed.

"Mr. Offutt: I object to Your Honor yelling at me and raising your voice like that.

"The Court: Just a moment. If you say another word I will have the Marshal stick a gag in your mouth." P. 1082.

7. The comment of the judge already referred to in the opinion, p. 12 [210 F.2d 701], supra, regarding the Government having "introduced plenty of proof" of abortions in January 1952. P. 1551.

8. The following incident occurred during the summation of Mr. McLaughlin, the prosecuting attorney, to the jury:

"[Mr. McLaughlin]: Not sure, eh? He is the one who was associating and contacting himself with those people; so that if he says they are unworthy of belief, what is he doing with them? What is he associating and performing abortions for? Besides, you know without him, naturally they could not be aborted, and it is like the criminal without the criminal lawyer; he cannot be successful. * * *

"Mr. Offutt: I object to that, if your Honor please. I object to that argument. * * * That reflects upon every lawyer that represents a man charged with a crime, and I say that is highly improper. * * *

"The Court: It does not reflect on every lawyer.

"Mr. Offutt: Well, it does reflect in this case—well, I move for a mistrial, and ask for an exception, your Honor." Pp. 1740–1741.

9. The following incident occurred during the summation of Mr. Offutt, the defense attorney, to the jury:

"[Mr. Offutt]: Now, Mr. McLaughlin does something which I don't do, and which anyone couldn't do, because the law protects the juvenile: he injects into this trial, by his own question, he asked Mrs. Steerman, the landlady, didn't Mr. Offutt tell you that Mrs. Ott had been a prostitute—just think of it—since—

"The Court (Interposing): Now, just a moment. Mr. McLaughlin never made any such statement, and there is no warrant for it in the record.

"What Mr. McLaughlin did was to ask a question as to whether you made that statement.

"Mr. Offutt: Well, that's what I just said.

"The Court: You said Mr. McLaughlin made the statement.

"Mr. Offutt: I said Mr. McLaughlin brought it in by asking Mrs. Steerman if I didn't tell her that.

"I will read it from the record.

"The Court: That's right, but—

"Mr. Offutt (Interposing): That's exactly what I said.

"The Court: You didn't state the matter accurately.

"You may proceed. I think you ought to stick to the record accurately.

"You may proceed." Pp. 1808–1809.

10. The record reveals that over five pages of the transcript are devoted to the trial court's summation of the Government's evidence, as opposed to four paragraphs for appellant's defense. Pp. 1847–1853.

11. In argument to the jury, the prosecutor referred to the defendant's invocation of his constitutional right not to answer questions at the time he was arrested, saying: "That seems to be a cute phrase nowadays, and if it is a pet phrase, ladies and gentlemen of the jury, consider the type of individual who uses it or says it." P. 1749. Then, again referring to the same matter, the prosecutor said: "Why, that is not natural and it is not logical, because we know when we hear of it, and especially today, those who stand on their constitutional rights have something to hide, one way or the other." P. 1750.

12. The following is a part of the prosecuting attorney's argument to the jury:

"[Mr. McLaughlin]: And I thought, as I listened to him testify, ladies and gentlemen, what if your sister or your mother happened to be in that neighborhood, and on the spur of the moment, in a fainting spell, or something, you required a doctor and walked in there, not knowing who he was or what he was, but merely seeing the doctor's sign on the door, and becoming suddenly ill or sick, you go down in that basement with this defendant. And especially you hearing now as to how he operates, and you go home at night and say, 'I wonder what he did with my wife. I wonder what he did with my daughter when he had her down there, with not a soul in

hearing distance, or anyone to come to her aid if anything did happen.'

"I don't know. I don't know whether it is the law, or what it is, but it seems to me that at least it must be a standard practice that when a doctor specially treats women, or has women clientele, that he should have at least a nurse around there.

"He should have a woman of some kind around there when he treats them, and especially if the treatment requires disrobing of that woman." Pp. 1754–1755.