UNITED STATES of America, Appellee,

v.

Patricia M. DONATO, Appellant.

No. 95–3195.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 10, 1996.

Decided Nov. 8, 1996.

As Amended Jan. 17, 1997.

Robert L. Weinberg argued the cause for appellant, with whom John G. Kester and J. Roger Williams, Jr., Washington, DC, were on the briefs.

Mark J. Ehlers, Assistant United States Attorney, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Elizabeth Trosman, Assistant United States Attorneys, were on the brief. Thomas A. DiBiase, Washington, DC, entered an appearance.

Before WALD, SILBERMAN, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

Separate opinion filed per curiam.

SENTELLE, Circuit Judge:

Appellant Patricia Donato and Charles Fraser were indicted on three counts charging conspiracy, mail fraud, and wire fraud. The indictment alleged that Donato and Fraser had conspired to have Fraser steal Donato's car so that Donato could collect insurance benefits and be freed from the obligations of her lease. On the first day of trial Fraser pled guilty. Fraser subsequently testified for the government against Donato. After a ten-day trial, the jury returned a verdict of guilty on all three counts of the indictment.

The trial was marked by frequent clashes between the trial judge and Donato's attorney. Donato now raises several challenges to her conviction. Finding four of them to have merit, we reverse and remand for a new trial.

## I. BACKGROUND

Appellant is an engineer and former Marine Corps officer with no prior criminal record. In September 1991, she leased a Nissan 300ZX automobile for five years from Infiniti Financial Services. The car quickly became burdensome. After someone unsuccessfully attempted to steal the car in February 1992, it became a joke between Donato and her friends that it might have been better had the would-be thief succeeded.

The government contended at trial that soon after the attempted theft, Donato decided to take steps to see to it that the car "disappeared." The government contended that Donato conspired with Charles Fraser, a handyman who had previously done work around appellant's house, to have him steal the car. Donato would then report the car stolen, collect on the insurance, and be freed from having to deal with the car and the lease.

While the existence of an agreement between Fraser and Donato was the central dispute at trial, it was not disputed that Fraser eventually took the car from the

parking lot at Donato's place of work. Fraser had enlisted a man named Barry Tate to help in the theft and disposal of the car. Unbeknownst to Fraser, Tate was an informant for the FBI. After some additional investigation, Fraser and Donato were both charged.

## II. ANALYSIS

As noted above, Donato raises several challenges to her conviction. We hold that four of them have merit. We consider three of her meritorious challenges seriatim herein. The fourth, we discuss in a separate *per curiam* opinion filed simultaneously herewith.

### A. *Rule 24(c)—Excusal of the Juror*

On the afternoon of Thursday, September 21, after the jury had been given its instructions, and before it left to begin deliberations, the trial judge asked if "there is any member among the original 12 jurors who believes that you are too sick or you've had some great emergency in your family and you cannot proceed to deliberation." Tr. 9/21/95 at 100–01. Juror 11 indicated that she might have such a problem.

Upon approaching the bench, Juror 11 said, "On Monday evening I do have airplane tickets to go to Boise, Idaho, to help teach a course." *Id.* at 101. The juror expressed concern that the deliberations might last until Monday evening. The trial judge agreed that they might and then, over the objection of Donato's attorney, dismissed the juror and empaneled the first alternate, with no further inquiry into the nature and purpose of the juror's trip. Donato now argues that this dismissal of the juror was reversible error under FEDERAL RULE OF CRIMINAL PROCEDURE 24(c).

■ Rule 24(c) authorizes a district court judge to dismiss a juror and empanel an alternate when the original juror "become[s] or [is] found to be unable or disqualified to perform [her] duties." Donato argues that the judge in her case erred by not making a finding that the dismissed juror was "unable or disqualified" to perform. She argues that this error prejudiced her "valued right to a

particular tribunal." *United States v. Jorn*, 400 U.S. 470, 484, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)).

We review a trial court's ruling under Rule 24(c) for abuse of discretion. *United States v. Simpson*, 992 F.2d 1224, 1228 (D.C.Cir.), *cert. denied*, 510 U.S. 906, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993). The government contends that the trial judge was acting within her discretion when she excused Juror 11.

■ We recognize that a trial judge is given great latitude under abuse of discretion review. We also recognize, however, that in order for our review of a Rule 24(c) determination to be meaningful, the trial court must indicate what factors it has considered in exercising its discretion. In this case the trial judge never explained why this juror could be excused under Rule 24(c). It is not clear from the record before us why this was so, and the court made no effort to either further develop the record or explain why the existing record was adequate to make this determination.

■ Matters entrusted to a trial judge's discretion are not unreviewable. Rather, they are subject to review for abuse of that discretion. If the record provided a full foundation for a determination that the juror was unable to fulfill her duties, we might be able to sustain the district court's dismissal of her without express findings, although certainly such findings would make review more satisfactory. Here, however, we have neither the findings nor a record sufficient in depth or in detail to support such findings. We must, therefore, conclude that we cannot sustain the district court's decision. *Cf. United States v. Sobamowo*, 892 F.2d 90, 95 (D.C.Cir.1989) ("The district judge was best positioned to determine whether dismissal of Juror 9 was warranted under the circumstances, and he gave an adequate account of the ground for his decision."), *cert. denied*, 498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990).

The government argues that even if the trial court did violate Rule 24(c), the defendant has not shown that she suffered preju-

dice from the error and the conviction therefore should not be reversed. This argument, however, misconstrues the nature of Rule 24. Rule 24 is carefully designed to provide defendants and the United States with a meaningful, if limited, say in the composition of the jury. Rule 24(a) provides for the questioning of prospective jurors either by counsel or the trial judge. Rule 24(b) determines the number of peremptory challenges that each side will be allowed to exercise. Rule 24(c) limits the use of alternate jurors to situations where regular jurors "become or are found to be unable . . . to perform their duties." This grant of a say to the parties is thwarted if judges can, without any reason at all, change the composition of the jury.

■ It will nearly always be impossible, however, for a defendant to show prejudice from a violation of Rule 24(c). If the government is correct that an appellant alleging a Rule 24(c) violation must show a specific prejudice from that violation, then Rule 24(c) would be entirely precatory. We are unwilling to conclude that a right as important as this one is incapable of being vindicated on appeal. We hold instead that Rule 24(c) violations, if they have been objected to at trial, will be reviewed under the familiar standard of *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Under *Kotteakos,* an error such as this one will be considered harmless so long as we can say "with fair assurance . . . that the judgment was not substantially swayed by the error." *Id.* at 765, 66 S.Ct. at 1248. *Kotteakos* will apply so long as the Rule 24(c) violation is non-constitutional. If the violation somehow rises to the level of a constitutional error, and in this case it does not, it will be reviewed under the stricter standard of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) ("before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt").

In this case we need not determine if this error, standing alone, was harmless under *Kotteakos.* Had this error been the only flaw in this trial it is possible that we would not have reversed. Considering it in conjunction with the other matters we discuss herein, however, we find reversal to be warranted.

## B. Rule 30—The Post–Charge Conference

■ At the close of her instructions to the jury, the judge invited counsel to the bench to ask if they had any additional instructions they wished to request of the court. Defendant's attorney indicated that he did have such a request and asked that the judge, pursuant to FEDERAL RULE OF CRIMINAL PROCEDURE 30, conduct this conference out of the presence of the jury. Tr. 9/21/95 at 84. The judge declined defendant's request, telling the defendant's attorney, "You are out of the presence of the jury. We are at the bench. Please proceed." Tr. 9/21/95 at 84. A discussion of the requested instructions immediately ensued.

Rule 30 states, "Opportunity shall be given to [object to the jury charge] out of the hearing of the jury *and, on request of any party, out of the presence of the jury.*" FED. R.CRIM.P. 30 (emphasis added). This Rule recognizes that a defendant may be prejudiced not only if the jury *hears* his attorney quarreling with the judge just before deliberations begin, but also if the jury *sees* the attorney in a confrontational pose. Appellant contends, and the government concedes, that the trial court erred in denying appellant's request that the jury be cleared from the room before the post-charge conference was held.

Appellant contends that violations of Rule 30 are presumptively prejudicial. This is not supportable. In *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), the Court considered whether and how prejudice must be shown when the trial court has violated Rule 30. The Court refused to hold that any non-compliance with Rule 30 requires reversal, and noted instead the "soundness" of the approach taken by the courts of appeals "which have in some manner examined the prejudice to the defendant in deciding whether reversal is required where there is a failure to comply with Rule 30." *Id.* at 135, 94 S.Ct. at 2916.

The Court in *Hamling* did not decide whether the defendant bears the burden of showing affirmatively that a Rule 30 violation is prejudicial or whether the prosecution has the burden of showing the absence of prejudice. The Court, after an examination of the trial record, was convinced that no matter where the burden lay, it was clear that the violation of the rule in *Hamling* was not prejudicial. *Id.*

In the instant case the situation is just the opposite. Here it is clear that the defendant was prejudiced by the district court's noncompliance with the Rule. The *Hamling* Court noted that Rule 30 is "principally designed to avoid the subtle psychological pressures upon the jurors which would arise if they were to view and hear defense counsel in a posture of apparent antagonism toward the judge." *Id.* at 134, 94 S.Ct. at 2916. Upon reviewing the twelve pages of post-instruction discussion between the judge and the attorney, it is apparent that the judge and the defense attorney were in a "posture of apparent antagonism."

We need not, therefore, answer the question of which party bears the burden with respect to prejudice. Here the prejudice is clear. In fact, given the purposes of the Rule, it is hard to imagine a situation where the prejudice could be much clearer. The post-instruction conference included the following exchanges:

Defendant's Attorney: [The instruction we believe should have been given] didn't have a number. We cited it in the memorandum we filed in response to Mr. Fitzgerald's request this morning.

The Court: I have not read any memorandum that you filed here this morning, all right. I have not read any memorandum that you filed here this morning. I did not invite any memorandums for this morning and I have not read any, okay. If you can tell me the nature of the instruction, maybe I can tell you whether or not I can give you one.

Defendant's Attorney: Your Honor, we received after court yesterday two handwritten requested instructions from Mr. Fitzgerald.

The Court: All right.

Defendant's Attorney: And we addressed the topic of those two instructions, and Mr. Williams is getting a copy of the memorandum in which we've—

The Court: I'm not going to read a memorandum. If you have another instruction, you might give that to me, but I am not going to read a memorandum for my edification nor for the jury's.

Tr. 9/21/95 at 85–86.

Defendant's Attorney: May I respectfully except?

The Court: Sir, you know the rules well enough to know just your objection puts the exception on the record. Please don't play games with the Court. What else?

*Id.* at 90.

Defendant's Attorney: I submit, Your Honor—

The Court: Excuse me. I'm not listening to any more argument. I have ruled on that issue, okay, because I could be here the rest of my life listening to you and I'm not going to stay here that long.

*Id.* at 95.

These examples typify the twelve-page exchange. While it is impossible for us to know just what expressions and gestures accompanied the harsh words, we can hardly imagine a record which would more clearly evidence that the jurors had observed "defense counsel in a posture of apparent antagonism toward the judge." *Hamling*, 418 U.S. at 134, 94 S.Ct. at 2916. No matter which party bears the burden on the prejudice issue, it is clear that on this record, prejudice has been shown. This violation of Rule 30, under the analysis established by *Hamling*, is enough by itself to warrant reversal.

### C. Improper Statements in Prosecutor's Summation

Donato claims that the prosecutor's summation contained three improper statements sufficiently prejudicial to warrant reversal. The three statements to which she objects are (1) the prosecutor's claim that defendant would have had to pay "a fortune" had she terminated the lease early, (2) his assertion

that Donato had admitted to being in a scheme with Fraser, and (3) his calling her a liar.

■ We can quickly dismiss her second and third claims of error. The prosecutor stated in his summation that "she admitted she told the special agents that there was a scheme and she and Fraser were involved." Tr. 9/20/95 at 137. Appellant claims that this was a reversible mischaracterization of trial testimony. Agent Caldwell, however, had testified at trial that Donato had told him at an interview at her house that she and Fraser had discussed having her car disappear, that Fraser had known where the vehicle was going to be, and that no one else was involved in the scheme except for her and Fraser. Tr. 9/14/95 at 133–35. The statements of the prosecutor that Donato now challenges were a fair, if disputed, characterization of that testimony.

■ As to her third claim, Donato argues that the prosecutor engaged in reversible misconduct by calling her a liar. This argument is foreclosed by *United States v. Dean*, 55 F.3d 640 (D.C.Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1288, 134 L.Ed.2d 232 (1996). In *Dean*, this court said that it could conceive of no "reason in law why the words 'lie' and 'lying' should be banned from the vocabulary of summation, particularly in cases that turn on the defendant's credibility." *Id.* at 665. This case certainly turned on the defendant's credibility. Thus, while we would commend more civil language to the representatives of the United States, it cannot have been reversible error for the prosecutor to have called the defendant a liar.

■ Her initial contention, however, has considerably more merit. In his summation the prosecutor stated that if Donato had returned the car before the lease expired "it was going to cost her a fortune." The prosecutor urged the jury to "figure out what the remaining four years of the lease times about $600 a month would have cost if she had surrendered the car to Infiniti." As the government now concedes, this was factually incorrect. Had Donato returned the car early, she would have been able to subtract the

"realized value" from the amount of the payments remaining on the lease. These amounts were very nearly equivalent, so it would have cost Donato almost nothing to return the car early.

It is clear that it is error for a prosecutor to mischaracterize evidence in a summation. *Gaither v. United States*, 413 F.2d 1061, 1079 (D.C.Cir.1969). It is also clear, however, that an error in a prosecutor's summation will only rarely warrant reversal of a conviction. In order to warrant reversal, an improper prosecutorial remark must cause substantial prejudice to the defendant. In determining whether a defendant has suffered substantial prejudice, this court looks at "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks." *United States v. Monaghan*, 741 F.2d 1434, 1443 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985). Applying the *Monaghan* test to the prosecutor's misstatement, we conclude that reversal is appropriate on this ground as well.

First, the consequences of the prosecutor's misstatement were potentially severe. His misstatement provided a motive for the defendant to have committed this crime. In the absence of this improper statement, the only motive the prosecutor presented to the jury was that the defendant stood to gain approximately $1,600 in insurance proceeds. It is far less likely that the defendant would have committed this crime for $1,600 than it is that she would have committed it to free herself of a commitment to pay Infiniti $600 a month for four years. This is particularly true given that the defendant was a former Marine Corps officer who was gainfully employed as a systems engineer at Martin Marietta.

Second, the district court took no steps to correct this misstatement. The defendant's attorney brought the error to the attention of the district court and requested that the court issue a curative instruction. Tr. 9/21/95 at 93–94. The district court refused. Tr. 9/21/95 at 95. To make matters worse, the judge then improperly shortened the amount of time that the defendant's attorney could use for closing argument. *See D. Ct.*

*Mem. Order* at 3 (Appellant's Appendix at 1025). This made it harder for the attorney himself to correct the factual error that the prosecutor had made.[1]

Third, it was by no means certain that the jury would have delivered a conviction in the absence of the improper remarks. As noted above, the prosecutor's improper remarks presented the jury with a motive for the defendant to have committed this crime. It is possible that these remarks swayed some jurors who would have been reluctant to convict had the only motive presented to them been recovery of $1,600 in insurance proceeds. Viewed from our perspective, this case seems close enough that we cannot say with confidence that the prosecutor's misstatement did not affect the integrity of the jury's verdict. Given this, we are required to hold that this is a third ground for the reversal of her conviction.

### D. Other Claims

In addition to her valid claims, the appellant makes a number of additional claims that we reject. Most of these meritless claims require no discussion, especially considering our decision to reverse. We will dwell briefly on two, however, because they have the potential to be relevant if Donato is retried.

■ The first is Donato's claim that the Jencks Act requires the government to turn over to the defendant notes and 302 reports of FBI interviews with Fraser, and also notes of government witness Agent Raymond Jechorek. The Jencks Act requires the government to turn over to the defense pre-trial statements made by witnesses who testify at trial. 18 U.S.C. § 3500 (1994). The term "statement" is defined, *inter alia*, as "a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(e)(2).

In *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), the Supreme Court explained that the Jencks

Act covered statements that could fairly be used by the defense to impeach a government witness. In order that this goal be achieved, these statements had to be limited to those that could properly be called the witness' own words. *Id.* at 352, 79 S.Ct. at 1224–25. Notes from an interview with a witness that were not the whole interview but rather a "substantial selection" of the interview were not covered. *Id.* at 352–53, 79 S.Ct. at 1225. Here, the agent testified that he included in his account of his interview with Fraser everything that he (the agent) considered pertinent. The agent engaged in "substantial selection," recording not the entire interview, but only those portions he found pertinent. Under *Palermo*, the agent's notes and 302 report from his pre-trial interview with Fraser are not covered by the Jencks Act. As for the notes taken by Agent Jechorek as he surveilled Fraser, we need not determine whether or not these constitute statements of the agent for Jencks purposes. In light of the disposition which we make of this appeal, that ruling cannot change the result, and we do not know whether the question will recur on retrial. We therefore offer no instruction on the matter but leave its resolution in the next instance for the district court in light of such other evidence as may be available at that time, if the government elects to proceed with a new trial in this matter.

■ The second rejected claim that requires some discussion is Donato's assertion that the evidence was insufficient to convict her of conspiracy with Fraser to defraud the insurance company. She claims that there was no evidence that she and Fraser ever discussed insurance.

A verdict must be upheld against a claim of insufficient evidence if " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Poston*, 902 F.2d 90, 94 (D.C.Cir.1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Considering all of the evidence in this case in the light most

---

1. We further consider the trial court's handling of the parties' summations in our accompanying

*per curiam* opinion.

favorable to the government, and resolving all credibility judgments against Donato, a rational jury could have concluded that Donato and Fraser had conspired to have her car disappear. A rational jury also could have concluded that Donato would complete their scheme by contacting her insurance company and fraudulently accepting the proceeds. This is all that is required to reject Donato's insufficiency of the evidence claim.

## III. CONCLUSION

For the reasons set forth herein and those contained in the separate *per curiam* opinion published simultaneously herewith, we reverse appellant's criminal conviction.

*PER CURIAM:*

Donato makes one overarching argument that is both more difficult and more troubling than any of the particular violations she raises. Donato argues that the trial judge displayed a clear bias against her and her attorney such that it was impossible for her to receive a fair and impartial trial. She points to numerous instances in the record where she says the judge either made incorrect rulings on evidentiary issues, inappropriately interrupted her attorney, or made degrading remarks directed either at her or her attorney. The government responds that the overwhelming majority of the remarks Donato claims demonstrate impermissible bias were a direct response to her counsel's improper conduct, questions, and arguments.

We begin our analysis by noting that a district judge has wide discretion in monitoring the flow of a criminal trial. It is well within her discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior. Sharp words spoken by a trial court to counsel do not by themselves establish impermissible bias. There is a "modicum of quick temper that must be allowed even judges." *Offutt v. United States,* 348 U.S. 11, 17, 75 S.Ct. 11, 15, 99 L.Ed. 11 (1954).

The Supreme Court recently expounded on this principle in *Liteky v. United States,* 510

U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). The question before the Court in *Liteky* was the proper interpretation of 28 U.S.C. § 455. Section 455(b)(1) requires that a judge recuse himself "[w]here he has a personal bias or prejudice concerning a party." In considering when such a bias might be shown, the Court said,

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.... *Not* establishing bias or partiality ... are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.

*Id.* at 555, 114 S.Ct. at 1157.

*Liteky,* however, was a statutory case, where the claim was that the trial judge should have recused himself. Donato's claim is different. She claims that the district court judge displayed such bias against her and her attorney that she did not receive a fair trial. In this sense, her claim is similar to those brought before this court in *United States v. Edmond,* 52 F.3d 1080 (D.C.Cir.) (per curiam), *cert. denied,* —— U.S. ——, 116 S.Ct. 539, 133 L.Ed.2d 443 (1995), and *United States v. Logan,* 998 F.2d 1025 (D.C.Cir.), *cert. denied,* 510 U.S. 1000, 114 S.Ct. 569, 126 L.Ed.2d 469 (1993).

In *Edmond* appellants claimed that the trial court record was "replete" with instances showing the trial court's hostility to the defense. This overt hostility, argued the appellants, prejudiced the jury. *Edmond,* 52 F.3d at 1101. We rejected that argument, noting that the challenged remarks were "squarely within the District Court's discretion in controlling the conduct of the trial," that the remarks had been directed at defense counsel rather than at defendants, and that even if the remarks had been found to be prejudicial, "the impact on the jury of such a small number of instances as are cited here would have been minimal or lost in the course of the lengthy trial." *Id.* at 1101–02.

*Logan* is similar to *Edmond.* In *Logan* appellants argued that conflict between the district judge and one of appellant's lawyers had created the appearance that the court was not acting impartially and thus prejudiced the jury and denied appellants a fair trial. *Logan,* 998 F.2d at 1028. This court rejected appellants' arguments, noting that the trial court "was attempting to control difficult counsel who repeatedly flouted her orders," that most of the sharp exchanges had been outside the hearing of the jury, and that the judge's comments had been directed at the attorneys rather than at the defendants themselves. *Id.* at 1029.

■ These cases emphatically recognize the wide discretion granted district courts in monitoring the pace and conduct of a trial. They further recognize that it will occasionally be permissible in the exercise of that discretion to address sharp words to recalcitrant counsel. These cases also acknowledge, however, that there is a limit to how far a district court may go. While some hostility between attorneys and a trial judge may perhaps be inevitable, negative comments directed by a trial judge to a defendant or her counsel will warrant reversal "if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky,* 510 U.S. at 555, 114 S.Ct. at 1157; *see also Logan,* 998 F.2d at 1029 ("[W]e must determine 'whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to perfect, trial.' ") (quoting *United States v. Pisani,* 773 F.2d 397, 402 (2d Cir.1985)). We hold that the hostility expressed in this case reached and crossed this threshold. We therefore reverse on this ground as well.

Two important factors distinguish this case from *Edmond* and *Logan.* First, the negative comments in this case were more concentrated, frequent, and critical than they were in either of those cases. In *Edmond* this court found that none of the challenged comments were prejudicial. It noted, however, that even if they had been prejudicial, the "impact on the jury of such a small number of instances as are cited here would have been minimal or lost in the course of the [three-month] trial." 52 F.3d at 1102. It is not clear from the reported opinion how long the *Logan* trial lasted, but the dissenter noted, "The trial was long and arduous." 998 F.2d at 1033. In this case, by contrast, the trial lasted approximately two weeks. The relative brevity of this trial makes it more likely that the judge's negative comments colored the entire trial. Because this trial was shorter, the jury here was less likely to consider these comments to be discrete and aberrational. The comments were therefore more likely to affect the jury's ability to deliver a fair judgment.

Not only were the judge's comments in this trial more concentrated than those in *Logan* or *Edmond,* they also appear to have been more frequent and critical. A review of the trial record reveals that the judge frequently berated, interrupted, and otherwise spoke negatively to the defendant's attorney. During what were arguably the two most crucial moments of the trial for the defendant, *i.e.,* the cross-examination of Fraser and the direct examination of Donato herself, the trial judge addressed approximately 65 negative comments to the defendant's attorney, 55 of which were made in the hearing of the jury. The following selected passages capture some of the tenor of the interaction between the trial court judge and the defendant's attorney:

Defendant's Attorney: Your Honor, may I be heard in response?

The Court: You may not be heard. You may ask the question.

Defendant's Attorney: Thank you, Your Honor. When did you first speak with government representatives about—

The Court: Oh, no, no, no, no. Then maybe you'd better approach the bench.

Tr. 9/14/95 at 29.

Defendant's Attorney: Was that in or about January of 1993?

Fraser: I would say in that time frame.

Defendant's Attorney: So, it is fair to say that you continued—

The Court: No, no, no. Don't you dare characterize this witness's testimony. Don't you dare. And that's exactly what you were getting ready to do, "Isn't it

fair," and I know that's what you were getting ready to do, and that's improper.

Tr. 9/14/95 at 82.

Defendant's Attorney: Do you recall whether you used the word "stolen"?

The Court: Used the word what?

Defendant's Attorney: Whether he used the word "stolen"?

Fraser: When?

Defendant's Attorney: At the conversation in the month you can't recall but where the subject you say first came up.

The Court: No one knows what you're talking about except you.

Defendant's Attorney: Let me try again.

The Court: You'd certainly better try it again. The jury won't know what he's answering if he answers.

Tr. 9/14/95 at 145.

Defendant's Attorney: Your Honor, we've had a lot of—

The Court: Excuse me.

Defendant's Attorney: I'm sorry.

The Court: You know I have been here. You know I've been here, don't you?

Defendant's Attorney: No, I don't, actually.

The Court: You don't know?

Defendant's Attorney: To Danker's, no.

The Court: I'm saying to you, you know I have been here in this courtroom, don't you?

Defendant's Attorney: Of course.

The Court: You've never missed me, have you?

Defendant's Attorney: Certainly not, Your Honor.

The Court: Okay. Well, I certainly know what you're talking about.

Tr. 9/18/95 at 145–46.

Defendant's Attorney: Did your work for Martin Marietta ever involve you in going into the DOT building?

The Court: How dare you ask that question. There is no relevance to that now, all right. No relevance. You heard me, sir.

Tr. 9/18/95 at 149.

All of the above, and numerous similar, exchanges took place in open court. The judge saved some of her more critical comments for conferences at the bench.

The Court: I can't believe you. I honestly and truly cannot believe you. Mr. Weinberg, I have just never seen such an egregious display of disrespect for the Court. What is it you want to ask me?

Defendant's Attorney: With respect, Your Honor, no disrespect of the Court is intended.

The Court: Excuse me—

Defendant's Attorney: I was trying to comply with the Court's ruling not to ask leading questions by obtaining an advance ruling as to whether the last question I wanted to ask would be considered leading.

The Court: Just let me say this to you. I shouldn't even have to tell an attorney not to ask leading questions. I shouldn't even have to tell an attorney not to ask leading questions. I should not have to have exercised so many rulings in this case about leading questions. I would suggest to you that by the second year of law school most law students, not to mention lawyers, know what a leading question is. So, please, sir, don't tell me that you, a member of the bar for more than 30 years, could come in here and say to me that you were trying to avoid asking leading questions. You should never suggest that. You know better. And then to stand there and ask me if you can ask a question in the presence of the jury for me to determine whether or not it's leading is disingenuous. It is disingenuous. It is disingenuous. It is absolutely disingenuous.

Tr. 9/19/95 at 38.

The Court: That question could only bring about hearsay, asking him did he ever hear Ms. Donato mention anything about her car. That would be clearly hearsay.

Defendant's Attorney: May I proffer the reason for the question?

The Court: I don't care what the reason for the question is. Do you agree with me that that would be inadmissible hearsay?

Defendant's Attorney: If offered for the truth of it.

The Court: I don't care for what purpose. I don't care what purpose. Wouldn't you agree that it's inadmissible hearsay?

Defendant's Attorney: It's not inadmissible if it's offered for the purpose for which I'm offering it. I'm simply trying to direct the witness's attention to October 8, 1992. If I ask him if he recalls that specific day, he won't. If I ask him if he recalls the day before he heard the car was stolen then—

The Court: No, sir. No, sir. No, sir. That's inadmissible hearsay.

Tr. 9/15/95 at 99–100.

The government suggests that the trial court was evenhanded in her approach to the attorneys, but the record will not support such a conclusion. The government lists several examples of instances in which it says the court interrupted the prosecutor or restricted the answers of government witnesses. In these cited instances, however, the court's intrusion frequently was either neutral or actually helped the government. The following example is typical of those cited by the government:

Prosecutor: Your Honor, again I would ask that those—

The Court: I would do it just a little differently. I would present to him 7A and ask him if I can identify that and tell us what it is, and then 7B. That's the way I think you should do it.

Prosecutor: Thank you, Your Honor. I appreciate the Court's preference.

The Court: Yes.

Tr. 9/13/95 at 111.

The government's claim of evenhanded treatment is further belied by a comparison of the judge's behavior during the parties' closing arguments. Numerous times during his summation the prosecutor referred to Ms. Donato as a liar. *See, e.g.,* Tr. 9/20/95 at 141–43. The judge allowed this to go on. While this was not reversible error, it does provide an interesting · counterpoint to the judge's treatment of the defendant's closing argument.

During the defendant's closing argument, her attorney was describing for the jury the testimony given by the character witness Retired Brigadier General Anson Schulz. Schulz had testified that at one point his company had worked on a joint project with Martin Marietta and he had worked under Ms. Donato. In reminding the jury of this testimony, Donato's attorney referred to her as a "former second lieutenant in the Marines." This occasioned an objection from the prosecutor and a lengthy bench conference during which the judge berated Donato's attorney for mentioning that Donato had been a second lieutenant, even though there was record evidence that she had been in the Marines and that she had gone to Officer Candidate School. While the judge allowed the prosecutor to call the defendant a liar, she did not allow the defendant's attorney to make reference to favorable character evidence that was arguably already in the record. The judge clearly gave the government a freer reign than she allowed to the defendant.

The government further argues that the judge's comments are not enough to justify reversal on this ground because they do not rise to the level of hostility expressed by the court in *Peckham v. United States,* 210 F.2d 693 (D.C.Cir.1953). We agree with the government that no one comment by the trial judge in this case rises to the level of the trial judge's warning in *Peckham* that if the defendant's attorney said "another word, I will have the Marshal stick a gag in your mouth." *Id.* at 704. We think, however, that the frequency, intensity, and one-sidedness of the court's hostility raise a serious question as to whether the trial court evidenced sufficient bias that the defendant was unable to receive a fair trial. *Logan,* 998 F.2d at 1029 ("[W]e must determine 'whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to perfect, trial.'").

Even if we were still inclined to uphold the conviction against this claim of error a second factor distinguishes this case from *Logan* and *Edmond.* In both *Logan* and *Edmond,*

we upheld a conviction against claims that the trial judge had expressed such hostility toward the defense that a fair trial was impossible. In each of these cases, this court found it significant that the challenged remarks of the trial judge had been directed at the attorneys rather than at the defendants themselves. *Edmond*, 52 F.3d at 1101; *Logan*, 998 F.2d at 1029.

In this case, by contrast, the trial judge did not exercise a similar restraint. On a number of occasions, the court sharply criticized the defendant. The following exchanges took place in the jury's presence:

Donato: Could you ask me that again, Mr. Weinberg. I'm getting—

Defendant's Attorney: May I rephrase the question, Your Honor?

The Court: Excuse me, ma'am. Let me just say this to you. We are in a court of law. We are not at a social event. You should listen very carefully to the questions put to you by your attorney and you should respond to only that question being asked, all right.

Donato: I am trying desperately, Your Honor—

The Court: As I said to you—

Donato:—to answer those questions.

The Court: Let me say to you we don't care how desperately you are trying to answer them. What we want you to do is to listen carefully to him and respond to him, all right—

Tr. 9/19/95 at 27–28.

The Court: Excuse me ma'am. That really isn't the answer to the question. What, if anything, he asked you, transpired as a result of your meeting and discussing with him the work in your home on that date at the Hawk and Dove?

Donato: That's what I was trying to answer, Your Honor.

The Court: You can answer it a lot more directly than you were attempting to.

Donato: I'll give it another try.

The Court: No, no, no, no. It's not a matter of giving it another try. It's simply a question of answering the question as it was asked, all right.

Tr. 9/19/95 at 9–10.

The Court: ... So, instead of telling us what you did, can you answer his question?

Donato: I am trying, Your Honor, yes.

The Court: No, no, you're not. Answer his question.

Tr. 9/19/95 at 30.

Donato: I'm trying, Your Honor.

The Court: Well, no, you're not. No, you're not.

Tr. 9/19/95 at 50.

These comments are troubling because they suggest, in a case where the defendant's credibility was a crucial issue, that the judge mistrusted the defendant. This court has noted before that " 'jurors hold the robed trial judge in great awe and reverence' and 'his lightest word or intimation is received with deference, and may prove controlling.' " *United States v. Barbour*, 420 F.2d 1319, 1322 (D.C.Cir.1969) (quoting *Hawkins v. United States*, 310 F.2d 849, 852 (D.C.Cir. 1962), and *Starr v. United States*, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894)). While this may somewhat overstate the case, it is certainly true that a jury is likely to give great credence to a judge's view of the credibility of a witness. Trial judges should, to the greatest extent possible, avoid giving any hint as to whether they believe a particular witness is credible. This is especially true when the witness in question is the defendant. In this case the judge's comments suggested that the defendant was not to be trusted.

These comments, combined with the near-constant criticism of the defendant's counsel, raise in us a serious doubt as to whether this defendant received a fair trial. We have no choice, therefore, but to reverse on this ground as well.

We wish to emphasize that we are working no dramatic change in the law of this Circuit. Trial judges have always had, and continue to have, a wide discretion in conducting the trials before them. That discretion has always been limited by the requirement that the defendant receive a fair trial. In this case that standard was not met.

## Conclusion

For the reasons set forth above, we conclude that the conviction must be reversed. At oral argument both parties agreed that if this case is retried, it should be reassigned. We agree with the parties and order that if this case does return to trial, it is to be assigned to a different judge.